IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM and DORIS ARNOLD, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MYLAN, N.V., HEATHER BRESCH and ROBERT J. COURY, <br><br> Defendants. | Civ. A. No. 15-cv-00821 <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED ELECTRONICALLY** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs City of Riviera Beach General Employees Retirement System ("Riviera Beach") and Doris Arnold ("Arnold," and together with Riviera Beach, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are based upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, Plaintiffs' investigation, which included, without limitation: (a) review and analysis of filings made by Mylan, Inc. with the Securities and Exchange Commission (the "SEC"); (b) review and analysis of filings made by Mylan N.V.("New Mylan") with the SEC; and (c) review and analysis of press releases, public statements, news articles, and other publications concerning a merger between Mylan Inc. ("Old Mylan" or the "Company") and Abbott Laboratories ("Abbott Labs") that resulted in the formation of New Mylan, a corporation established under the laws of the Netherlands. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint

after a reasonable opportunity for discovery.  Many of the facts supporting the allegations

contained herein are known only to Defendants or are exclusively within their custody and/or

control.

## SUMMARY OF THE ACTION

1.      In November 2014, Old Mylan entered into an agreement to a merger with Abbott

Labs (the "Merger") to combine Old Mylan with certain non-U.S. businesses of Abbott Labs (the

"Abbott Business") and create New Mylan, organized under the laws of the Netherlands.

Although the Merger was structured as a "tax inversion" to allow Mylan to lessen its obligations

under the U.S. tax code, Old Mylan and its Executive Chairman and its CEO (the "Individual

Defendants") repeatedly assured the Company's shareholders that shares of New Mylan would

be traded on the NASDAQ Global Select Market ("NASDAQ"), and the surviving corporation

would abide and be bound by the NASDAQ listing rules, just as Old Mylan was.

2.      The representations made by Old Mylan and the Individual Defendants (the

"Defendants") that New Mylan would abide by the NASDAQ listing rules, however, was a

sham.  NASDAQ's listing rules require that shareholders be allowed to vote to approve any

transaction that would transfer more than 20% of a company's voting power to a third party.  On

April 3, 2015, just five weeks after the Merger closed, New Mylan's Board of Directors

announced that they had, without any prior shareholder approval, issued a "Call Option" to a

specially-created Dutch foundation (a "*stichting*") that, if exercised, will allow the foundation to

acquire sufficient preferred shares of New Mylan to give it control of New Mylan's voting stock,

thereby depriving shareholders of all voting power (also called a "Dutch poison pill").  Although

the capital structure of New Mylan approved by the shareholders of Old Mylan in connection

with the merger included Preferred Shares that could be used for a Dutch poison pill,

2

NASDAQ's listing rules required specific shareholder approval prior to the actual issuance of those shares or any option to acquire them, unlike a typical U.S.-style poison pill. In seeking approval for the Merger, the Individual Defendants did not seek shareholder approval for the issuance of any Dutch poison pill, and by approving the Merger, shareholders of Old Mylan did not authorize the issuance of securities that would deprive them of voting control of the surviving corporation.

3.      Accordingly, the Individual Defendants breached their fiduciary duties to the shareholders of Old Mylan by (a) misrepresenting that, in seeking approval for the Merger, the Individual Defendants knew – but failed to disclose – that they had already agreed to incorporate a foundation and grant it such a call option at the time they solicited the vote of Old Mylan shareholders in favor of the Merger; and/or (b) falsely representing that New Mylan would be bound by and would comply with NASDAQ's listing rules, which required specific shareholder approval prior to the issuance of securities that would transfer 20% or more of the voting power of the surviving corporation to a third party.

4.      In failing to disclose this material information, the Individual Defendants breached their fiduciary duties to Old Mylan shareholders. As a consequence of this breach of duty, Old Mylan shareholders were deprived of their chance to cast a fully-informed vote on the Merger. Old Mylan shareholders were further harmed when Defendants breached their representations that New Mylan would be bound by and comply with NASDAQ's listing rules. The vote should be rescinded or, in the alternative, shareholders of Old Mylan should be awarded damages.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Plaintiffs are citizens of Florida and New Jersey.  The defendants are citizens of states other than Florida and New Jersey.

6.      This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  Old Mylan was, until the time of the Merger, a Pennsylvania corporation headquartered in Canonsburg, Pennsylvania, and the Individual Defendants were the CEO and the include the Executive Chairman of Old Mylan and, following the Merger, New Mylan.  Defendants are subject to personal jurisdiction in this Judicial District.  Venue is proper here because the claims herein arose from events, actions and failures to act which occurred in this Judicial District.

## THE PARTIES

7.      Plaintiff Riviera Beach was a holder of Old Mylan common stock at all relevant times.  Those shares were converted into shares of New Mylan in connection with the Merger.  Rivera Beach is a citizen of the State of Florida.

8.      Plaintiff Arnold was a holder of Old Mylan common stock at all relevant times.  Those shares were converted into shares of New Mylan in connection with the Merger.  Arnold continues to own those shares of New Mylan.  Arnold is a citizen of the State of New Jersey.

9.      Defendant New Mylan is a public limited liability company organized and existing under the laws of the Netherlands, with a U.S. headquarters located at the Robert J. Coury Global Center, 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  New Mylan was incorporated on July 7, 2014, as New Moon B.V. ("New Moon"), a private limited liability

4

company organized under the laws of the Netherlands, for the purpose of holding Old Mylan and the Abbott Business.  Upon consummation of the Merger, New Moon was renamed "Mylan N.V."  Pursuant to the Merger, New Mylan is the successor in interest, and assumed all the rights, assets, liabilities and obligations of Old Mylan.  New Mylan is a citizen of the Commonwealth of Pennsylvania.

10.     Defendant Heather Bresch ("Bresch") was, at all relevant times hereto, the CEO and a director of Old Mylan, and is currently the CEO and a director of New Mylan.  Bresch became the CEO of Old Mylan on January 1, 2012.  Bresch is a citizen of the Commonwealth of Pennsylvania.

11.     Defendant Robert J. Coury ("Coury") was, at all relevant times hereto, the Chairman, Executive Chairman and a director of Old Mylan, and is currently Executive Chairman a director of New Mylan.  Coury was previously the CEO of Old Mylan from September 2002 to December 31, 2011.  Coury is a citizen of the Commonwealth of Pennsylvania.

## RELEVANT NON-PARTIES

12.     Old Mylan was, until the time of the Merger, a Pennsylvania corporation headquartered at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  Old Mylan was a global pharmaceutical company that, through its subsidiaries, developed, licensed, manufactured, marketed, and distributed generic, branded generic, and specialty pharmaceuticals.  Old Mylan common stock was traded on the NASDAQ Stock Market under the symbol "MYL."

13.     Abbott Labs is a global healthcare company headquartered at 100 Abbott Park Road, Abbott Park, Illinois.  Prior to the Merger, Abbott's non-U.S. developed markets specialty and branded generics business (the "Abbott Business") operated in Canada, Japan, Australia,

New Zealand, and Europe.  The Abbott Business included manufacturing facilities in France and Japan, and its product line included a variety of specialty and branded generic pharmaceuticals that covered a range of therapeutic categories in an extensive array of dosage forms and delivery systems.

## FACTUAL BACKGROUND

14.     In recent years, certain corporations domiciled in the United States have sought to lessen or eliminate their tax obligations to our country by reincorporating overseas through a complex transaction called a "tax inversion."  In a tax inversion, the U.S. corporation seeking to reincorporate merges with and into a corporation organized under the laws of a foreign country – one with a more favorable tax structure – and the shares of the U.S. corporation are cancelled and exchanged for shares in the newly-created (and usually identically named) foreign entity. President Barack Obama has called the practice "unpatriotic,"[1] and has urged Congress to close the loophole in the U.S. tax laws that make inversions possible.  One regulation limiting the tax benefits of inversions provides that the surviving foreign corporation nonetheless will be treated as being domiciled domestically if the ownership of the original U.S. corporation makes up 80% or more of the surviving foreign corporation.  26 C.F.R. § 1.7874-1.  As a result, one strategy

---

[1]     President Barack Obama's weekly address from July 26, 2014:

"… Even as corporate profits are as high as ever, a small but growing group of big corporations are fleeing the country to get out of paying taxes.  They're keeping most of their business inside the United States, but they're basically renouncing their citizenship and declaring that they're based somewhere else, just to avoid paying their fair share. … The best way to level the playing field is through tax reform that lowers the corporate tax rate, closes wasteful loopholes, and simplifies the tax code for everybody.  But stopping companies from renouncing their citizenship just to get out of paying their fair share of taxes is something that cannot wait.  That's why, in my budget earlier this year, I proposed closing this unpatriotic tax loophole for good. Democrats in Congress have advanced proposals that would do the same thing.  A couple Republicans have indicated they want to address this too, and I hope more join us."

adopted by U.S. corporations seeking to effect a "tax inversion" has been to include in the merger a separate corporation with different ownership such that the shareholders of the original U.S. corporation will control less than 80% of the surviving foreign entity.

15.     Mylan was one such corporation.  On November 4, 2014, the Board of Directors of Old Mylan announced that the Company had entered into a merger agreement with Abbott Labs pursuant to which Old Mylan would combine with certain non-U.S. businesses of Abbott Labs to form New Mylan, a company established under the laws of the Netherlands. Specifically, pursuant to an Amended and Restated Business Transfer Agreement and Plan of Merger with New Mylan, Moon of PA Inc. ("Merger Sub"), and Abbott Labs (the "Merger Agreement"), New Mylan would acquire Old Mylan and the Abbott Business, with New Mylan being the surviving entity.  In order to stay below the 80% threshold to effect a tax inversion, Old Mylan shareholders would own approximately 78% of New Mylan after the Merger, with affiliates of Abbott owning the remaining approximately 22%.  New Mylan's ordinary shares were to be listed on the NASDAQ Global Select Market under the ticker symbol "MYL."

***Old Mylan's Directors Represented that Despite the Tax Inversion, Mylan Shares Would Still Be Traded On NASDAQ and the Company Would Be Bound By NASDAQ's Listing Rules, Which Require Shareholder Approval Prior the Issuance of Securities that Would Transfer 20% or more of an Issuer's Voting Power***

16.     Since 1976, Mylan has been publicly traded on NASDAQ, and has been subject to NASDAQ's listing rules.  Consistently in its Annual Reports filed with the SEC on Form 10-K, for example, Old Mylan repeatedly assured investors that:

> Effective internal controls are necessary for Mylan to provide reasonable assurance with respect to its financial reports.  We spend a substantial amount of management and other employee time and resources to comply with laws, regulations and standards relating to corporate governance and public disclosure. In the U.S., such regulations include the Sarbanes-Oxley Act of 2002, SEC regulations and the NASDAQ listing standards.

17.    In seeking approval for the Merger, the Individual Defendants assured investors in

the proxy statement/prospectus (the "Proxy") filed with the SEC on Form DEFM14A and mailed

to Old Mylan shareholders to solicit the vote of Old Mylan shareholders in favor of the Merger,

that despite reincorporating to the Netherlands, stock in the surviving corporation would

continue to be traded on NASDAQ, and the Company would continue to be bound by that

exchange's listing rules:

> If the Merger is completed, each share of Mylan common stock issued and
> outstanding immediately prior to the effective time of the Merger (the "effective
> time") will be cancelled and automatically converted into and become the right to
> receive one New Mylan ordinary share.  The one-for-one ratio is fixed, and, as a
> result, the number of New Mylan ordinary shares received by the Mylan
> shareholders in the Merger will not fluctuate based on the market price of a share
> of Mylan common stock prior to the Merger.  The New Mylan ordinary shares
> will be registered with the SEC and are expected to be listed on the NASDAQ
> Global Select Market ("NASDAQ") under the symbol "MYL."

18.    In addition, Proxy represented that:

> For so long as its shares will be listed on NASDAQ, New Mylan will be required
> to meet certain requirements relating to ongoing communication and disclosure to
> New Mylan shareholders, including a requirement to make any annual report filed
> with the SEC available on or through New Mylan's website and to comply with
> the 'prompt disclosure' requirement of NASDAQ with respect to earnings and
> dividend announcements, combination transactions, stock splits, major
> management changes and any substantive items of an unusual or non-recurrent
> nature.  Issuers listing shares on NASDAQ must also meet certain corporate
> governance standards, such as those relating to annual meetings, board
> independence, the formation and composition of nominating/corporate
> governance, compensation and audit committees, and approval by New Mylan
> shareholders of certain transactions.

19.    NASDAQ Rule 5635(b) provides unambiguously that "Shareholder approval is

required prior to the issuance of securities when the issuance or potential issuance will result in a

change of control of the Company."

20.    In addition, NASDAQ has published on its website the following FAQ to explain

what constitutes a "change of control" for purposes of Rule 5635:

FAQ - What is a change of control for purposes of the shareholder approval requirement of Listing Rule 5635(b)?

Generally, a change of control would occur when, as a result of the issuance, an investor or a group would own, or have the right to acquire, 20% or more of the outstanding shares of common stock or voting power and such ownership or voting power would be the largest ownership position.  However, NASDAQ will consider all facts and circumstances concerning a transaction, including whether there are any other relationships or agreements between the company and the investor or group.

***The Individual Defendants Mislead Old Mylan Shareholders Regarding New Mylan's Intent to Implement a Dutch Poison Pill and Eliminate the Voting Power of Public Shareholders***

21.     The Proxy the Individual Defendants used to solicit the Old Mylan shareholder vote disclosed that following its incorporation under Dutch law, New Mylan could – ***in theory*** – be able to adopt certain defensive measures that might make New Mylan a less attractive target for takeovers and that could negatively affect the market price for New Mylan shares going forward.

22.     To explain, Dutch law permits the formation of a Dutch foundation (the stichting), to take voting control in Dutch entities.  The stichting device involves a company granting an "independent" foundation a call-option to buy preference shares that, if activated, allows the foundation to take control of the company for the purposes of protecting the interests of other Dutch stakeholders.  According to *The Wall Street Journal*, a stichting was an obscure legal entity used "primarily by Dutch charities," and then used during World War II to transfer "ownership to stichtings based in the Dutch Antilles in the Caribbean to protect assets from the German occupiers, experts say."  New Mylan is now using this obscure legal device as a "Dutch poison pill" to block any action by potential acquirors or activist shareholders supporting an acquisition.  Unlike American poison pills, which are limited in scope and duration and subject to a board decision to end the pill (including the decision by a new board voted in by

shareholders), the stichting device puts decisions on the deal *exclusively* in the hands of the

foundation, bypassing the board.

      23.    In soliciting shareholder approval for the Merger, the Individual Defendants

disclosed that a Dutch poison pill theoretically would be available as an anti-takeover defense to

New Mylan.  The Proxy's Risk Factors included the following:

> ***PROVISIONS IN NEW MYLAN'S GOVERNANCE ARRANGEMENTS OR
> THAT ARE OTHERWISE AVAILABLE UNDER DUTCH LAW COULD
> DISCOURAGE, DELAY, OR PREVENT A CHANGE IN CONTROL OF NEW
> MYLAN AND MAY AFFECT THE MARKET PRICE OF NEW MYLAN
> ORDINARY SHARES.***
>
> Some provisions of New Mylan's governance arrangements or that are otherwise
> available under Dutch law, such as the ability to grant to a foundation (*stichting*)
> (a "Dutch foundation") a call option to acquire preferred shares to preserve the
> long−term value of New Mylan, may discourage, delay, or prevent a change in
> control of New Mylan, even if such a change in control is sought by New Mylan
> shareholders.

Proxy at 22 (emphasis in original).

      24.    The Proxy further explained:

> Under Dutch law, various protective measures are permissible.  New Mylan's
> governance arrangements include several provisions that may have the effect of
> making a takeover more difficult or less attractive, including:
>
> > • the power of the New Mylan Board to issue to a Dutch foundation a call
> > option to acquire preferred shares that, if exercised (see "—Rights
> > Agreement/Preferred Shares"), could delay a potential takeover or allow
> > New Mylan to further discuss with a potential acquirer its future plans for
> > New Mylan as well as to search for strategic alternatives; and
> >
> > • requirements that certain matters, including the amendment of the New
> > Mylan Articles (see "—Amendment of Governing Documents" above),
> > may only be brought to the General Meeting for a vote upon a proposal by
> > the New Mylan Board.

*      *      *

Dutch law permits a company to issue to a Dutch foundation a call option to
acquire preferred shares that, if exercised, could delay a potential takeover or

10

allow such company to further discuss with a potential acquiror its future plans for the company as well as to search for strategic alternatives. ***New Mylan has not issued a call option to a Dutch foundation for New Mylan preferred shares.*** A Dutch foundation's governing documents generally provide that the call option will be exercised if the Dutch foundation determines such exercise to be (i) in the best interests of the company and the business conducted by it and (ii) necessary to maintain the status quo and/or to enable the company's management to explore alternative scenarios.  By exercising the option to acquire a company's preferred shares, a Dutch foundation temporarily dilutes the voting rights of the company's holders of ordinary shares, thereby preventing the holders of ordinary shares from exercising control while the preferred shares remain outstanding.  The number of preferred shares held by a Dutch foundation is limited so that, after giving effect to the exercise of a call option, it will not exceed the number of outstanding ordinary shares of the company at such time.

Proxy at 179-181 (emphasis added).

25.     Although the Proxy contained generic disclosures about the availability of a Dutch poison pill to New Mylan, the Proxy did not seek approval for, nor did the shareholders' vote to approve the Merger provide, any authority for the surviving company to *issue* securities that would remove the voting control from the public shareholders of Old Mylan.

26.     Each of the Individual Defendants approved the Proxy and signed a letter sent to Old Mylan shareholders asking that Old Mylan shareholders approve the Merger on the terms described in the Proxy.

**New Mylan Announces the Dutch Poison Pill Shortly After Closing the Merger**

27.     On April 3, 2015, just five weeks after the Merger closed, New Mylan announced in a Form 8-K that it had entered into a Call Option Agreement with Stichting Preferred Shares Mylan (the "Foundation").  Under the Call Option Agreement, the Foundation was granted an option to acquire New Mylan preferred shares in an amount equal to the number of New Mylan ordinary shares issued.  The Call Option, accordingly, effectively grants the Foundation the absolute right to block any offer to buy New Mylan, for any reason at all.

11

28.     The issuance of the Call Option gives the Foundation the right to acquire more than 50% of the voting power of New Mylan.  Accordingly, under NASDAQ Rule 5635(b), the creation of the Dutch poison pill could not be accomplished without shareholder approval.

29.     New Mylan has already set about using the Call Option to its advantage and is citing this Option to fend off unwanted advances from a much larger competitor, Teva Pharmaceutical Industries Ltd. ("Teva").  Defendants had known about Teva's potential interest since prior to the time they sent the Proxy to solicit the vote of Old Mylan shareholders in favor of the Merger.  As a Sanford C. Bernstein & Co. analyst report has noted, New Mylan "could not be clearer" that it is not working primarily for its shareholders in seeking to fend off Teva:  New Mylan has explicitly noted in regulatory filings that under Dutch law, directors' duties extend to all stakeholders including "shareholders, creditors, employees, customers, and suppliers." Steven Davidoff Solomon, the Professor of Law at the University of California, Berkeley School of Law who writes as the "Deal Professor" for *The New York Times*, wrote that a statement issued by the Foundation "comes off as biased toward Mylan's management… It does not seem to be issued by a group of trustees that is supposed to look out for the best interests of the company."  The Call Option seeks to allow the Foundation to put the interests of New Mylan management and other New Mylan stakeholders above the interests of its common stockholder.

***The Vote by Shareholders of Old Mylan to Approve the Merger Was Ineffective for Purposes of NASDAQ Rule 5635(b)***

30.     NASDAQ Rule 5635(b) unambiguously requires shareholder approval "prior to the issuance of securities when the issuance or potential issuance will result in a change of control."

31.     Issuance of the Call Option to the Foundation gives the Foundation the right to acquire more than 20% of the voting power of New Mylan.  As such, shareholder approval was required prior to the issuance of the Call Option.

32.     The vote by shareholders of Old Mylan on the Merger approved a capital structure of New Mylan that included Preferred Shares that *could* be used in a Call Option involving a stichting.  The vote to approve the Merger, however, *did not* specifically approve the *issuance* of any such Preferred Shares.  According to Professor Davidoff Solomon, writing in *The New York Times*:

> Under Nasdaq and New York Stock Exchange rules, companies that are listed on exchanges in the United States cannot just issue shares.  Instead, limits are placed on share issues to protect shareholders from companies issuing hugely dilutive amounts of stock.
>
> Mylan is listed on the Nasdaq, which has a "20 percent rule," meaning that shareholder approval is required for any share issue that is more than 20 percent of the voting power of the company.
>
> Nasdaq also has a "change of control rule," which requires that any issue or potential issue of securities that would result in a change of control of the company must be preapproved by shareholders.
>
> ***The mere creation of the Dutch stichting most likely sets off a shareholder vote under both rules***.  The rules require that Mylan's shareholders must preapprove the issue of the shares to the stichting.  Note also that the change of control rule talks about the "potential issuance" of securities, so it has arguably already been set off.
>
> And yet there has been no vote by Mylan shareholders related to the creation of the stichting.

(Emphasis added.)

33.     In fact, as discussed above, by representing that New Mylan would be bound by the NASDAQ listing rules without concurrently disclosing and seeking approval for the *issuance* of Preferred Shares, the Individual Defendants necessarily implied that the vote by shareholders

of Old Mylan to approve the Merger did not constitute approval for the issuance of any Preferred

Shares.  According to Professor Davidoff Solomon:

> Mylan's proxy statement for [the Merger] speaks only of the potential formation
> of a stichting (the trust was set up on April 3, only a few days before Mylan's
> hostile bid for Perrigo).  ***There was no specific vote of shareholders on the
> stichting, which is presumably what Nasdaq rules require***.

> Indeed, there are federal rules about bundling proposals in proxies, and they
> would almost certainly require a separate vote on the creation of the Dutch trust.

(Emphasis added.)

34.     New Mylan has likewise acknowledged that NASDAQ listing rules specifically

require a shareholder vote to authorize the issuance of any securities that would transfer 20% or

more of the company's voting power to a third party.  On May 5, 2015, New Mylan filed a

preliminary proxy statement to seek shareholder approval for an offer the Company has made to

acquire Perrigo Company, plc, a limited liability company incorporated under the laws of Ireland

("Perrigo"), in a transaction that would transfer 39% of the company's voting control to Perrigo

shareholders.  In doing so, New Mylan expressly admitted that NASDAQ listing rules require a

separate shareholder vote to authorize the issuance of such shares:

> Under Dutch law, resolutions of a company's board of directors regarding a
> significant change in the identity or nature of the company or its business must be
> approved at a general meeting.  Such resolutions include the acquisition of a
> company or a stake in a company with a value of at least one-third of the assets of
> the company (calculated based on the most recently adopted annual accounts plus
> the explanatory notes to that balance sheet).  Based on Mylan's most recently
> adopted annual accounts, Perrigo is valued at greater than one-third of Mylan's
> assets.  The approval of Mylan shareholders at a general meeting is therefore
> required to consummate the Acquisition.  ***Also, under the NASDAQ listing rules,
> listed companies are required to obtain shareholder approval to issue, in
> connection with an acquisition, a number of ordinary shares that is greater
> than 20% of the company's total number of ordinary shares outstanding before
> the issuance***.  The approval of Mylan shareholders at a general meeting is
> therefore required to consummate the Share Issuance.  (Emphasis added.)

14

35.     Moreover, a vote by shareholders of Old Mylan to approve the issuance of

Preferred Shares would have been ineffective in any event, as the Call Option was issued by

New Mylan.  Accordingly, NASDAQ Rule 5635(b) required a separate approval by shareholders

of New Mylan prior to the issuance of the Call Option.

***To The Extent Individual Defendants Contend that the Vote By Old Mylan's Shareholders to
Approve the Merger Authorized the Issuance of the Call Option, the Proxy Was False and
Misleading***

36.     The Proxy did not seek approval for the Board of New Mylan to issue the Call

Option, and to the extent that the Individual Defendants already had agreed to implement a

Dutch poison pill the Proxy was materially misleading.

37.     Specifically, the definitive proxy filed by Old Mylan on December 24, 2014,

included as exhibits the following documents:

Annex A        Amended and Restated Business Transfer Agreement and Plan of Merger

Annex B        Form of Shareholder Agreement

Annex C        Form of Articles of Association of Mylan NV (New Mylan)

Annex D        Opinion of Centerview Partners LLC.

38.     Section 2.1 of the Form of Shareholder Agreement, <u>Restrictions on Offering
Transactions,</u> established certain restrictions on New Mylan's ability to issue equity securities for

a certain period following the closing of the Merger, but notably provided that "nothing in this

Section 2.1 shall prevent New Mylan from issuing any preference shares to the Foundation

(stichting) to which New Mylan has granted a call option to acquire such preference shares, ***as

contemplated by Section 2.6 of the Business Transfer Agreement***" (emphasis added).

39.     Section 2.6 of the Business Transfer Agreement, in turn, provided that "Mylan

and New Mylan shall take, or cause to have been taken, such actions as are necessary so that, as

15

of the Effective Time [(defined as the date and time the merger becomes effective)], ***the Additional Matters shall have been implemented***" (emphasis added).

40.    The term "Additional Matters" referred to in Section 2.6 of the Business Transfer Agreement was defined, in Section 1.1, as follows:  "'Additional Matters' shall mean the transactions set forth on Exhibit D."  The referenced, "Exhibit D", however, was omitted from the Proxy and not provided to Old Mylan's shareholders.

41.    The carve-out from New Mylan's covenant in Section 2.1 of the Form of Shareholder Agreement makes sense ***only if*** the creation of the foundation (and the concomitant agreement to grant it a call option) was among the "Additional Matters" identified on the withheld Exhibit D.

42.    During a January 29, 2015 special meeting, Old Mylan's shareholders voted to approve the Merger.  The Merger closed on February 27, 2015.

43.    The Individual Defendants breached their fiduciary duty of disclosure to Old Mylan shareholders by failing to disclose the material fact that New Mylan ***had already agreed*** to form a foundation and grant it a call option ***before*** the shareholders voted on the Merger.  The Individual Defendants' coy disclosure of the fact that New Mylan would have the "theoretical" ability to grant such a call option is insufficient under the facts here.

44.    By concealing New Mylan's pre-existing commitment to implement a Dutch poison pill, the Individual Defendants misrepresented the value of consideration to be received by Old Mylan shareholders in connection with the Merger.

45.    To explain, the total value of the Merger was approximately $5.3 billion.  The Proxy represented that following the Merger, shareholders of Old Mylan would own 78% of New Mylan, and Abbott would own 22% of New Mylan.  This implied that Old Mylan was

worth approximately $4.134 billion in the merger ($5.3 billion x 78%).  At the time of the

Merger, Old Mylan had outstanding 374,273,573 shares, implying that the each share of Old

Mylan was valued at $11.05 in the Merger.

46.     Economic studies indicate that U.S. companies with poison pills generally trade at

a 6% discount to companies that have not implemented a poison pill.  The Individual

Defendants' efforts to conceal the fact that New Mylan already had committed to implement a

Dutch poison pill, therefore, materially impacted the value of the consideration being offered to

shareholders of Old Mylan in the Merger.  By failing to disclose the full truth about the Call

Option, the Individual Defendants deprived the Old Mylan shareholders of the right to cast an

informed vote on whether they wanted to hold securities in a company that had a Dutch poison

pill in place and that, accordingly, likely would trade at a discount to where it would have traded

had it not had such an anti-takeover device in place.

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23, on

behalf of themselves and all similarly situated former shareholders of Old Mylan, who owned

shares of Old Mylan as of December 13, 2014, and were entitled to vote on the Merger (the

"Class"), and a subclass of all members of the Class who received shares of New Mylan in the

Merger and continuously owned shares of New Mylan through the April 3, 2015 formation of the

Foundation (the "Subclass").

48.     This action is properly maintainable as a class action.

49.     The Class and Subclass are so numerous that joinder of all members is

impracticable.  The Class and Subclass consist of thousands of shareholders who are scattered

throughout the United States.  As of October 29, 2014, there were 374,273,573 outstanding

common shares of Old Mylan.

50.     There are questions of law or fact common to the Class and the Subclass.  These questions include, inter *alia*: (a) whether the Individual Defendants breached their fiduciary duties to the shareholders of Old Mylan; (b) whether the Proxy was materially misleading; (c) whether Defendants breached the representations they made in the Proxy; (d) whether the vote on the Merger was effective; (e) whether shareholder approval was required prior to the issuance by New Mylan of the Call Option; and (f) whether the vote by shareholders of Old Mylan to approve the Merger was effective for purposes of approving the issuance of the Call Option as required by NASDAQ Rule 5635(b).

51.     The claims of Plaintiffs are typical of the claims of the Class and Subclass. Plaintiffs were shareholders of Old Mylan on the record date established by the Individual Defendants for purposes of obtaining approval for the Merger, and Plaintiff Arnold was a shareholder of New Mylan through the date Defendants' breached their representations in forming the Foundation.  Plaintiffs' claims are typical of other members of the Class and Subclass, and Plaintiffs are not subject to any unique claims or defenses by Defendants.

52.     Plaintiffs will fairly and adequately assert and protect the interests of the Class. The attorneys for Plaintiffs are experienced class action attorneys with a demonstrated successful history of representing shareholders' interests nationally.  Plaintiffs' chosen counsel is fully prepared and qualified to represent the interests of the Class and Subclass.  Plaintiffs do not have any conflict of interest that would impair their ability to prosecute this action on behalf of the Class and Subclass.  Plaintiffs and their counsel have adequate financial resources to assure that the interests of the Class and Subclass will be adequately represented and will not be harmed through the prosecution of this action

53.     Prosecution of this action as a class action also provides a fair and efficient method for adjudication of the controversy.  Common questions of law and fact predominate over any question affecting only individual members of the Class or Subclass; the size of the Class and Subclass indicates that prosecution of this action as a class action would be more efficient than the prosecution of individual claims by Class and Subclass members; the prosecution of separate actions by individual members of the Class and Subclass would create the risk of inconsistent or varying adjudications with respect to individual members of the Class Subclass, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class and Subclass, which would as a practical matter be disjunctive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and Subclass.

## COUNT I

## BREACH OF FIDUCIARY DUTY

### (Against the Individual Defendants)

54.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

55.     Plaintiffs bring this count on behalf of herself and the Class against the Individual Defendants for breach of fiduciary duty.

56.     The Individual Defendants owed the Class fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as directors of Old Mylan, the Individual Defendants had the power to influence and/or cause, and did influence and/or cause, Old Mylan

to engage in the practices complained of herein.  Each Individual Defendant was required to fully disclose the material circumstances, procedures, and terms of the Merger so that shareholders of Old Mylan could make a fully informed decision with respect to the Merger.

57.     The Individual Defendants failed to fulfill their fiduciary duties in connection with the Merger, which resulted in shareholders of Old Mylan being deprived of their opportunity to cast a fully informed vote with respect to the Merger.

58.     As a result of the Individual Defendants' breaches of fiduciary duty as set forth above, the Class has been harmed.

## COUNT II

## BREACH OF CONTRACT

### (Against Mylan, N.V. and the Individual Defendants)

59.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

60.     Plaintiff Arnold brings this count on behalf of herself and the Subclass against New Mylan (as successor in interest to Old Mylan) and the Individual Defendants for breach of contract.

61.     Old Mylan and Individual Defendants formed a contract with Plaintiffs and the other shareholders of Old Mylan in order to accomplish the reincorporation through the Merger. Specifically, Individual Defendants represented that New Mylan would comply with NASDAQ listing rules, including Rule 5635(b), in exchange for Plaintiffs' support for the Merger. Plaintiffs and the other Old Mylan shareholders accepted that offer, and a binding contract was formed.

62.     Plaintiffs and the other Subclass members performed their obligations under the contract, *i.e.*, they supported the Merger, refrained from objecting to the Merger, and/or voted in favor of the Merger.

63.     Through the Merger, New Mylan accepted all the rights and obligations of Old Mylan, including the contractual obligations of Old Mylan as described above.

64.     Defendants breached the contract by permitting New Mylan to adopt the Dutch poison pill and issue the Call Option without shareholder approval.

65.     Defendants' breach of contract has harmed Plaintiffs and the Subclass by depriving them of their right to vote on the issuance of any securities by New Mylan which would have the effect of transferring 20% or more of the voting power to a third party.

66.     Plaintiffs and the Subclass have no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Finding the Individual Defendants liable for breaching their fiduciary duties to the Class;

B.     Finding that New Mylan and Individual Defendants breached their contractual obligations to the Subclass;

C.     Rescinding the vote of shareholders of Old Mylan to approve the Merger;

D.     Awarding the Class compensatory damages, together with pre- and post-judgment interest;

E.     Awarding Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

F.     Awarding such other and further relief as is just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: July 10, 2015

> /s/ Benjamin J. Sweet
> Benjamin J. Sweet
> Carlson Lynch Sweet & Kilpela, LLP
> PNC Park
> 115 Federal Street, Suite 210
> Pittsburgh, PA 15212
> Tel: 412-322-9243
> Fax: 412-231-0246
>
> *Counsel for Plaintiffs*

OF COUNSEL:

Mark C. Gardy
James S. Notis
Meagan A. Farmer
GARDY & NOTIS, LLP
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508

Jay W. Eisenhofer
GRANT & EISENHOFER, P.A.
485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8505
Fax: 646-722-8502

Michael J. Barry
GRANT & EISENHOFER, P.A.
123 S. Justison Street
Wilmington, DE 19801
Tel: 302-622-7065
Fax: 302-622-7100