## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM, DORIS ARNOLD and ROOFERS LOCAL 149 PENSION FUND, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>MYLAN N.V., HEATHER BRESCH and ROBERT J. COURY,<br><br>     Defendants. | No. 2:15-cv-00821-CRE<br><br>(Consolidated with<br>No. 2:15-cv-00941-CRE)<br><br>Magistrate Judge Cynthia Reed Eddy<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED ELECTRONICALLY** |

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs City of Riviera Beach General Employees Retirement System ("Riviera Beach"), Doris Arnold ("Arnold"), and Roofers Local 149 Pension Fund ("Roofers," and together with Riviera Beach and Arnold, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are based upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, Plaintiffs' investigation, which included, without limitation: (a) review and analysis of filings made by Mylan, Inc. ("Old Mylan" or the "Company") with the Securities and Exchange Commission (the "SEC"); (b) review and analysis of filings made by Mylan N.V. ("New Mylan") with the SEC; (c) review and analysis of press releases, public statements, news articles, and other publications concerning a merger between Mylan Inc. and Abbott Laboratories ("Abbott Labs") that resulted in the formation of New Mylan, a corporation established under the laws of the Netherlands; and (d) review and analysis of press releases, public statements, news

articles, and other public information regarding an acquisition proposal for New Mylan by Teva Pharmaceutical Industries N.V. ("Teva") and Teva's withdrawal of that proposal. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.

## SUMMARY OF THE ACTION

1.      In November 2014, Old Mylan entered into an agreement to merge with Abbott Labs (the "Merger") in order to combine Old Mylan with certain non-U.S. businesses of Abbott Labs (the "Abbott Business") and create New Mylan, an entity organized under the laws of the Netherlands. The Merger was structured as a "tax inversion" to allow Mylan to lessen its obligations under the U.S. tax code.

2.      In order to induce Old Mylan shareholders to approve giving up the protections of Pennsylvania corporate law by re-incorporating in the Netherlands, Old Mylan, along with its Executive Chairman Robert J. Coury and its CEO Heather Bresch (the "Individual Defendants"), made a commitment to the Company's shareholders that shares of New Mylan would be traded on the NASDAQ Global Select Market ("NASDAQ") and that the surviving corporation would abide and be bound by the NASDAQ listing rules, just as Old Mylan was. In fact, approval of New Mylan's ordinary shares for listing on NASDAQ or the New York Stock Exchange ("NYSE") was a condition precedent to the consummation of the Merger.

3.      On January 29, 2015, Old Mylan's shareholders approved the Merger, thus creating a binding and enforceable agreement between the Company and Old Mylan's shareholders who voted for the Merger, received shares in New Mylan, and continue to hold

such shares.  Pursuant to that agreement, New Mylan – as Old Mylan's successor-in-interest – was obligated to provide the shareholder protections contained in the NASDAQ listing rules.

4.      The representation made by Old Mylan and the Individual Defendants (collectively, "Defendants") that New Mylan would abide by the NASDAQ listing rules, however, was a sham.  NASDAQ's listing rules unambiguously require that shareholders be allowed to vote to approve any transaction that would result in a change of control.

5.      Despite the agreement that Defendants used as the bait to obtain shareholder approval of the Merger, however, on April 3, 2015, just five weeks after the Merger closed, New Mylan's Board of Directors announced that it had, without any prior shareholder approval, issued a call option (the "Call Option") to a specially-created Dutch foundation (the "Foundation" or the "Stichting") that would effectuate precisely the change of control that the NASDAQ rules prohibit.  Specifically, upon exercise of the Call Option, the Foundation would acquire sufficient preferred shares of New Mylan to give it a controlling voting stake in New Mylan, thereby depriving shareholders of all voting power and depriving them of material economic value.  Such a call option is sometimes referred to as the "Dutch Poison Pill."

6.      When Old Mylan's shareholders approved the Merger, they did so in exchange for the promise that, among other things, they would be protected by NASDAQ's listing requirements and therefore be in position to approve, prevent, or in certain instances effectuate any change in control.  Those protections were important to Old Mylan's shareholders. Although lowering taxes may be attractive to investors in a U.S. corporation, a rational investor may also determine that giving up valuable U.S. federal and state legal protections afforded to investors outweighs any tax benefits.

7.      Through their misrepresentations, in breach of their fiduciary duties of honest disclosure pursuant to the Pennsylvania law applicable to their conduct as Old Mylan directors and officers, the Individual Defendants also induced Old Mylan's shareholders to accept inadequate consideration for their Old Mylan shares.  The Individual Defendants failed to disclose to Old Mylan shareholders that the value of their post-Merger New Mylan shares would be significantly discounted as a result of shareholders' loss of control over the Company, and because New Mylan would be immune from being acquired in an unsolicited takeover.

8.      Indeed, shareholders came to understand the diminished value of their New Mylan holdings soon after the Merger closed, when the Individual Defendants used the Stichting, in bad faith, to deny New Mylan's shareholders the opportunity to accept an acquisition proposal from Teva that would have provided at least a ***48.3% premium*** to New Mylan's unaffected share price.   The Individual Defendants' egregious misuse of corporate machinery to deny shareholders an opportunity to sell their company at a premium ultimately resulted in the withdrawal of the Teva bid and a significant, corresponding decline in the value of New Mylan.

9.      Had the Individual Defendants not misrepresented the rights of Old Mylan shareholders if the Merger were approved, and New Mylan not breached the binding agreement to preserve important corporate governance protects that it had assumed from Old Mylan upon closing of the Merger, the Stichting would never exist, Teva's bid would have been positioned to succeed, and Old Mylan's shareholders would have enjoyed the value they believed was being provided to them.

10.      In seeking approval for the Merger, the Individual Defendants did not seek or obtain shareholder approval to issue the Call Option or any preferred shares pursuant to the Dutch Poison Pill.  By approving the Merger, shareholders of Old Mylan did not authorize the

issuance of securities that would deprive them of voting control of the surviving corporation. Despite vague references to the possibility of implementing a Dutch Poison Pill in the future, the Director Defendants failed to disclose that they intended to implement the device as soon as any third party threatened their control of New Mylan, much less that they would do so in a manner that violated the NASDAQ listing rules that provided Old Mylan shareholders the comfort to approve the re-incorporation to Dutch corporate law.

11.     Accordingly, New Mylan, as Old Mylan's successor-in-interest, is liable to the shareholders who accepted the offer of a Merger predicated on the legal protections that the NASDAQ rules provide – *i.e.*, the shareholders of Old Mylan who voted for the Merger, received shares in New Mylan, and continue to hold such shares (subject to appropriate exclusion of Defendants and their relatives and affiliates, the "Class").

12.     As a consequence of the Company's contractual breach, the value of the shareholders' investments has been harmed, as the Class now holds New Mylan shares that are less valuable than their Old Mylan shares were for the reasons discussed herein, including because a hostile takeover such as the Teva bid is effectively foreclosed.

13.     In addition, the Individual Defendants breached their fiduciary duties to the shareholders of Old Mylan by (a) failing to disclose that they already intended to incorporate a foundation and grant it such a call option at the time that they solicited the vote of Old Mylan shareholders in favor of the Merger; and/or (b) falsely representing that New Mylan would be bound by and would comply with NASDAQ's listing rules, which require explicit shareholder approval prior to the issuance of securities that result in a change of control of the Company.

14.     As a consequence of that breach of duty, Old Mylan shareholders were deprived of significant value, including because they forfeited control over the company but did not

receive the valuable consideration due upon a change of control.  Old Mylan shareholders were also deprived of their chance to cast a fully informed vote on the Merger.

15.     To remedy the Company's contractual breach, and the Individual Defendants' breaches of fiduciary duty, Plaintiffs thus seek a declaration that the grant of the Call Option to the Stichting was not authorized in conformity with applicable law, and therefore is invalid. Alternatively, the shareholder vote approving the Merger should be rescinded or, if declaratory relief is unavailable, shareholders of Old Mylan should be awarded damages for breach of contract, violation of the Individual Defendants' duty of disclosure under Pennsylvania law that applied to their conduct as Old Mylan directors, the loss of the Teva bid, and the loss of a change-of-control premium, as more fully set forth below.

## JURISDICTION

16.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiffs and Defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  Moreover, Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.  Old Mylan was, until the time of the Merger, a Pennsylvania corporation headquartered in Canonsburg, Pennsylvania, and the Individual Defendants include the CEO and the Executive Chairman of Old Mylan and, following the Merger, of New Mylan.

18.     Each Defendant has minimum contacts with this district because each has entered into contracts in the district, has frequently traveled to the district on Old Mylan business, or has authorized acts and actions that have had a sufficient impact in the district or on Old Mylan's shareholders and investors residing here to justify the exercise of jurisdiction.

## THE PARTIES

19.     Plaintiff Riviera Beach was a holder of Old Mylan common stock at all relevant times.  Those shares were converted into shares of New Mylan in connection with the Merger. Riviera Beach is a citizen of the State of Florida.

20.     Plaintiff Arnold was a holder of Old Mylan common stock at all relevant times. Those shares were converted into shares of New Mylan in connection with the Merger.  Arnold continues to own those shares of New Mylan.  Arnold is a citizen of the State of New Jersey.

21.     Plaintiff Roofers was a holder of Old Mylan common stock at all relevant times. Those shares were converted into shares of New Mylan in connection with the Merger.  Roofers continues to own those shares of New Mylan.  Roofers is a citizen of the State of Michigan.

22.     Defendant New Mylan is a public limited liability company organized and existing under the laws of the Netherlands, with a U.S. headquarters located at the Robert J. Coury Global Center, 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  New Mylan was incorporated on July 7, 2014 as New Moon B.V. ("New Moon"), a private limited liability company organized under the laws of the Netherlands, for the purpose of holding Old Mylan and the Abbott Business.  Upon consummation of the Merger, New Moon was renamed "Mylan N.V."  Pursuant to the Merger, New Mylan is the successor in interest and assumed all the rights, assets, liabilities and obligations of Old Mylan.  New Mylan is a citizen of the Commonwealth of Pennsylvania.

23.     Defendant Heather Bresch ("Bresch") was, at all relevant times hereto, the CEO and a director of Old Mylan and is currently the CEO and a director of New Mylan.  Bresch became the CEO of Old Mylan on January 1, 2012.  Bresch is a citizen of the Commonwealth of Pennsylvania.

24.     Defendant Robert J. Coury ("Coury") was, at all relevant times hereto, the Chairman, Executive Chairman and a director of Old Mylan and is currently Executive Chairman and a director of New Mylan.  Coury was previously the CEO of Old Mylan from September 2002 to December 31, 2011.  Coury is a citizen of the Commonwealth of Pennsylvania.

25.     Defendants Bresch and Coury were directors of Old Mylan at the time of the Merger and are referred to herein as the "Individual Defendants."

## RELEVANT NON-PARTIES

26.     Old Mylan was, until the time of the Merger, a Pennsylvania corporation headquartered at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  Old Mylan was a global pharmaceutical company that, through its subsidiaries, developed, licensed, manufactured, marketed, and distributed generic, branded generic, and specialty pharmaceuticals.  Old Mylan common stock was traded on NASDAQ under the symbol "MYL."

27.     Abbott Labs is a global healthcare company headquartered at 100 Abbott Park Road, Abbott Park, Illinois.  Prior to the Merger, the Abbott Business operated in Canada, Japan, Australia, New Zealand, and Europe.  The Abbott Business included manufacturing facilities in France and Japan, and its product line included a variety of specialty and branded generic pharmaceuticals that covered a range of therapeutic categories in an extensive array of dosage forms and delivery systems.

## FACTUAL BACKGROUND

28.     In recent years, certain corporations domiciled in the United States have sought to lessen or eliminate their tax obligations to the United States by reincorporating overseas through a complex transaction called a "tax inversion."  In a tax inversion, the U.S. corporation merges with and into a corporation organized under the laws of a foreign country – one with a more favorable tax structure – and the shares of the U.S. corporation are cancelled and exchanged for shares in the newly-created (and usually identically named) foreign entity.  President Barack Obama has called the practice "unpatriotic," and has urged Congress to close the loophole in the U.S. tax laws that makes inversions possible.[1]

29.     One regulation limiting the availability of the tax benefits of inversions provides that the surviving foreign corporation will be treated as being domiciled in the U.S. if the owners of the original U.S. corporation end up owning 80% or more of the surviving foreign corporation.   26 C.F.R. § 1.7874-1.   In order to game the regulation and avoid otherwise applicable taxation, one strategy adopted by U.S. corporations seeking to effect a tax inversion has been to structure a merger with a smaller third party, such that the shareholders of the original U.S. corporation will control less than 80% of the surviving foreign entity.

---

[1]     In his July 26, 2014 weekly address, President Barack Obama stated:

"… Even as corporate profits are as high as ever, a small but growing group of big corporations are fleeing the country to get out of paying taxes.  They're keeping most of their business inside the United States, but they're basically renouncing their citizenship and declaring that they're based somewhere else, just to avoid paying their fair share. … The best way to level the playing field is through tax reform that lowers the corporate tax rate, closes wasteful loopholes, and simplifies the tax code for everybody.  But stopping companies from renouncing their citizenship just to get out of paying their fair share of taxes is something that cannot wait.  That's why, in my budget earlier this year, I proposed closing this unpatriotic tax loophole for good. Democrats in Congress have advanced proposals that would do the same thing.  A couple Republicans have indicated they want to address this too, and I hope more join us."

30.     Mylan was one such corporation to game a merger to create a tax inversion.  On November 4, 2014, Old Mylan entered into an Amended and Restated Business Transfer Agreement and Plan of Merger (the "Merger Agreement") with New Moon, Moon of PA Inc. ("Merger Sub"), and Abbott Labs in order to combine Old Mylan with certain non-U.S. businesses of Abbott Labs under the corporate name New Mylan, an entity headquartered in the U.K., organized under the laws of the Netherlands, and still enjoying a material portion of its revenues through the U.S. markets.

31.     Pursuant to the Merger Agreement, New Mylan would acquire Old Mylan and the Abbott Business, with New Mylan being the surviving entity.  In order to stay below the 80% threshold to effect a tax inversion, Old Mylan shareholders would own approximately 78% of New Mylan after the Merger, with affiliates of Abbott Labs owning the remaining approximately 22%.  In other words, besides acquiring Abbott Labs' non-U.S.-based operations, the Merger served solely to shift Old Mylan's tax obligations to a new entity governed by Dutch corporation law.  New Mylan's ordinary shares were to be listed on the NASDAQ Global Select Market under the ticker symbol "MYL."

***Old Mylan's Directors Falsely Represented that, After the Merger, New Mylan Shares Would Be Traded On NASDAQ and the Company Would Be Bound By NASDAQ's Listing Rules***

32.     Since 1976, Mylan has been publicly traded on NASDAQ and has been subject to NASDAQ's listing rules.  Old Mylan repeatedly assured investors in its Annual Reports filed with the SEC on Form 10-K that:

> Effective internal controls are necessary for Mylan to provide reasonable assurance with respect to its financial reports.  We spend a substantial amount of management and other employee time and resources to comply with laws, regulations and standards relating to corporate governance and public disclosure. In the U.S., such regulations include the Sarbanes-Oxley Act of 2002, SEC regulations and the NASDAQ listing standards.

33.     In seeking approval for the Merger, the Individual Defendants assured investors in the proxy statement/prospectus filed with the SEC on December 24, 2014 on Form DEFM14A and mailed to Old Mylan shareholders to solicit votes in favor of the Merger (the "Proxy") that stock in the surviving corporation would continue to be traded on NASDAQ, and the Company would continue to be bound by that exchange's listing rules:

> If the Merger is completed, each share of Mylan common stock issued and outstanding immediately prior to the effective time of the Merger (the "effective time") will be cancelled and automatically converted into and become the right to receive one New Mylan ordinary share. The one-for-one ratio is fixed, and, as a result, the number of New Mylan ordinary shares received by the Mylan shareholders in the Merger will not fluctuate based on the market price of a share of Mylan common stock prior to the Merger. ***The New Mylan ordinary shares will be registered with the SEC and are expected to be listed on the NASDAQ Global Select Market ("NASDAQ") under the symbol "MYL."***

34.     Furthermore, the Proxy repeatedly highlighted the importance of the Company's continued listing on a prominent exchange. It was a prerequisite to the consummation of the Merger that New Mylan ordinary shares be approved for listing on NASDAQ or the NYSE. In a clear attempt to assure Old Mylan shareholders that they would continue to enjoy certain protections despite the Company's reincorporation in the Netherlands, Defendants wrote: "***[i]t is a condition to the completion of the Merger that the New Mylan ordinary shares to be issued to Mylan shareholders pursuant to the Merger be approved for listing on NASDAQ or the New York Stock Exchange***." (Emphasis added.)

35.     Both NASDAQ and the NYSE have rules governing transactions that result in a change of control. NASDAQ Rule 5635(b) provides unambiguously that "[s]hareholder approval is required prior to the issuance of securities when the issuance or potential issuance will result in a change of control of the Company." The NYSE rules have an analogous provision. According to NYSE Rule 312.03 (d), "[s]hareholder approval is required prior to an

issuance that will result in a change of control of the issuer." Accordingly, it made no difference whether the Company chose to list New Mylan shares on the NYSE or NASDAQ exchange, as both exchanges provide parallel and material protections for stockholders with respect to approval of change in control transactions.

36.     In recognition of the shareholder protections afforded by NASDAQ rules, the Proxy affirmatively represented that:

> For so long as its shares will be listed on NASDAQ, New Mylan will be required to meet certain requirements relating to ongoing communication and disclosure to New Mylan shareholders, including a requirement to make any annual report filed with the SEC available on or through New Mylan's website and to comply with the 'prompt disclosure' requirement of NASDAQ with respect to earnings and dividend announcements, combination transactions, stock splits, major management changes and any substantive items of an unusual or non-recurrent nature. ***Issuers listing shares on NASDAQ must also meet certain corporate governance standards***, such as those relating to annual meetings, board independence, the formation and composition of nominating/corporate governance, compensation and audit committees, and ***approval by New Mylan shareholders of certain transactions***. (Emphasis added.)

37.     In other words, the Individual Defendants assured shareholders in the Proxy that post-Merger, new Mylan would comply with applicable listing requirements, including those concerning corporate governance and shareholder approval. Defendants further represented that they expected New Mylan to be listed on NASDAQ, as Old Mylan shares had been listed for decades. Defendants recognized and emphasized that listing on NASDAQ subjected New Mylan to certain listing requirements, including meeting "certain corporate governance standards" such as "approval by New Mylan shareholders of certain transactions."

38.     Old Mylan's solicitation of shareholder support for the Merger, including through the Proxy, constituted an offer to Old Mylan's shareholders, which included the Proxy's representations concerning compliance with NASDAQ's listing requirements pertaining to

12

corporate governance and shareholder approval.  Old Mylan's shareholders accepted that offer when they voted to approve the Merger, thereby forming a contract with the company.

***The Individual Defendants Misled Old Mylan Shareholders Regarding New Mylan's Intent to Implement a Dutch Poison Pill and Eliminate the Voting Power of Public Shareholders***

39.    Independent of their violations of NASDAQ's listing requirements, the Proxy that the Individual Defendants used to solicit the Old Mylan shareholder vote disclosed that, following its incorporation under Dutch law, New Mylan could – ***in theory*** –adopt certain defensive measures that might make New Mylan a less attractive target for takeovers and that could negatively affect the market price for New Mylan shares going forward.  The Individual Defendants did not disclose, however, that they already intended to pursue such actions.

40.    Specifically, Dutch law permits the formation of a foundation – a stichting – to take voting control in Dutch entities.  The stichting device involves a company granting an "independent" foundation a call option to buy preferred shares that, if activated, allows the foundation to take control of the company and to oppose takeovers that would otherwise be the most beneficial outcome for the stockholders.  According to the *Wall Street Journal*, a stichting was an obscure legal entity used "primarily by Dutch charities," and then used during World War II to transfer "ownership to stichtings based in the Dutch Antilles in the Caribbean to protect assets from the German occupiers."

41.    Notably, although the stichting device is permitted under Dutch law, it would likely violate all U.S. state corporate law regimes, including Pennsylvania's.  While investors in U.S. corporations know and rely upon their power to persuade directors to eliminate anti-takeover devices, and have as leverage their ability to vote unresponsive directors out of office,

the stiching eliminates that protection by transferring control to a supposedly independent, but in all events unaccountable, third party.

42.     New Mylan is now using that obscure legal device as a Dutch Poison Pill to block any action by potential acquirers or activist shareholders supporting an acquisition.   Unlike American poison pills, which are limited in scope and duration and subject to a board decision to end the pill (including the decision by a new board voted in by shareholders), the stiching device puts decisions on the deal *exclusively* in the hands of the foundation, bypassing the board.

43.     In soliciting shareholder approval for the Merger, the Individual Defendants disclosed that a Dutch Poison Pill would theoretically be available as an anti-takeover defense to New Mylan.   The Proxy's disclosures concerning the theoretical possibility of a Dutch Poison Pill also stated:

> Under Dutch law, various protective measures are permissible.   New Mylan's governance arrangements include several provisions that may have the effect of making a takeover more difficult or less attractive, including:
>
> > • the power of the New Mylan Board to issue to a Dutch foundation a call option to acquire preferred shares that, if exercised (see "Rights Agreement/Preferred Shares"), could delay a potential takeover or allow New Mylan to further discuss with a potential acquirer its future plans for New Mylan as well as to search for strategic alternatives; and
> >
> > • requirements that certain matters, including the amendment of the New Mylan Articles (see "Amendment of Governing Documents" above), may only be brought to the General Meeting for a vote upon a proposal by the New Mylan Board.
>
> <div align="center">*          *          *</div>
>
> Dutch law permits a company to issue to a Dutch foundation a call option to acquire preferred shares that, if exercised, could delay a potential takeover or allow such company to further discuss with a potential acquiror its future plans for the company as well as to search for strategic alternatives.   *New Mylan has not issued a call option to a Dutch foundation for New Mylan preferred shares.* A Dutch foundation's governing documents generally provide that the call option will be exercised if the Dutch foundation determines such exercise to be (i) in the

<div align="center">14</div>

best interests of the company and the business conducted by it and (ii) necessary to maintain the status quo and/or to enable the company's management to explore alternative scenarios.  By exercising the option to acquire a company's preferred shares, a Dutch foundation temporarily dilutes the voting rights of the company's holders of ordinary shares, ***thereby preventing the holders of ordinary shares from exercising control*** while the preferred shares remain outstanding.  The number of preferred shares held by a Dutch foundation is limited so that, after giving effect to the exercise of a call option, it will not exceed the number of outstanding ordinary shares of the company at such time.  (Emphasis added.)

44.     Although the Proxy contained generic disclosures about the availability of a Dutch Poison Pill to New Mylan, the Proxy did not seek approval for and the shareholder vote to approve the Merger did not provide, any authority for the surviving company to *issue* securities that would transfer voting control away from the public shareholders of Old Mylan.  Rather, the Proxy specifically stated that "New Mylan has not issued a call option to a Dutch foundation for New Mylan preferred shares."

45.     The Proxy also contained, as discussed above, assurances that New Mylan would comply with NASDAQ listing requirements, including that any change of control be put to a shareholder vote.  Although the Proxy disclosed the possibility of a call option to the Stichting, it did not disclose that the New Mylan Board might issue that option without shareholder approval.

46.     Each of the Individual Defendants approved the Proxy and signed a letter sent to Old Mylan shareholders asking that Old Mylan shareholders approve the Merger on the terms described in the Proxy.

***New Mylan Announces the Dutch Poison Pill Shortly After Closing the Merger***

47.     On April 3, 2015, just five weeks after the Merger closed, New Mylan announced in a Form 8-K that it had entered into a Call Option Agreement with Stichting Preferred Shares Mylan.  Under the Call Option Agreement, the Foundation was granted an option to acquire New Mylan preferred shares in an amount equal to the number of New Mylan ordinary shares issued.

Accordingly, the Call Option effectively granted the Foundation the absolute right to block any offer to buy New Mylan, for any reason at all.

48.     The issuance of the Call Option gave the Foundation the right to acquire 50% of the voting power of New Mylan.  Accordingly, Defendants' decision to implement the Dutch Poison Pill without shareholder approval violated NASDAQ Rule 5635(b), with which Defendants had agreed to comply.

***The Stichting Was Created and Control Transferred In Order to Stop a High-Premium Takeover Bid from Teva***

49.     The Individual Defendants did not employ the unlawful Stichting on a clear day. Rather, they breached Old Mylan's prior agreement with its shareholders in order to kill an unsolicited takeover bid that would tremendously benefit the investors, but would lead to the Individual Defendants losing their jobs.

50.     Beginning in the fall of 2014 (just before the Proxy was sent to Old Mylan shareholders), there were rumors reported in the financial press that Teva was interested in pursuing an acquisition of Old Mylan.  Then, on April 21, 2015, Teva went public with an offer to acquire New Mylan for cash and stock valued at $82 per share, or approximately $43 billion in total.  That offer represented a 48.3% premium to New Mylan's unaffected share price at the time.

51.     On April 3, 2015, just five weeks after the Merger closed, New Mylan announced that it had created the Stichting and entered into the Call Option Agreement.  The Call Option gave the Stichting the power to acquire 50% of the voting power of New Mylan and thus the absolute right to block any offer to buy New Mylan.

52.     New Mylan breached the agreement with Old Mylan's shareholders to comply with NASDAQ listing requirements in direct response to plans from Teva, a larger competitor, to

pursue an acquisition of New Mylan on a hostile basis.  As a result, and as analysts and commentators have observed, shareholders have been deprived of the opportunity to receive significant value for their New Mylan shares.  Importantly, Defendants knew about Teva's potential interest prior to sending the Proxy to solicit votes from Old Mylan shareholders in favor of the Merger.  As a Sanford C. Bernstein & Co. analyst report noted, New Mylan "could not be clearer" that it was not working primarily for its shareholders in seeking to fend off Teva.

53.     Indeed, neither the New Mylan Board nor the supposedly independent Stichting appear to be acting in shareholders' best interests.  Steven Davidoff Solomon, the Professor of Law at the University of California, Berkeley School of Law who writes as the "Deal Professor" for *The New York Times*, wrote that rather than evidencing the Stichting's supposed independence, a statement issued by the Foundation "comes off as biased toward Mylan's management . . . It does not seem to be issued by a group of trustees that is supposed to look out for the best interests of the company."  By granting the Call Option to the Foundation, the Foundation is empowered to put the interests of New Mylan management and other New Mylan stakeholders above the interests of its common stockholders.

54.     In addition to granting the Call Option to the Foundation, Defendants sought to fend off Teva's takeover bid by pursuing New Mylan's own hostile takeover of its smaller competitor, Perrigo Company plc ("Perrigo").  New Mylan first contacted Perrigo regarding a proposed merger on April 6, 2015.  On April 8, 2015, New Mylan publicly announced a proposal to acquire Perrigo for cash and stock worth $205 per Perrigo share, or approximately $29 billion. On April 29, 2015, New Mylan raised its offer to $232.23 per Perrigo share, or over $34 billion. Perrigo has thus far rebuffed Mylan's efforts to reach agreement on a consensual merger transaction.

55.     On June 19, 2015, Teva announced that it had acquired shares representing 4.61% of the total outstanding shares of New Mylan and that it would vote those shares against New Mylan's hostile takeover of Perrigo.

56.     With Teva still pressing its hostile acquisition of New Mylan and New Mylan being rebuffed on its own hostile acquisition of Perrigo, the Foundation on July 23, 2015 publicly announced that it had formally exercised the Call Option and acquired voting control of New Mylan.  The Foundation stated that it did so in order to block a hostile takeover of New Mylan by Teva and that the Foundation would use 4.61% of its voting power to vote for the Perrigo acquisition, thus negating the 4.61% stake that Teva intended to vote against the Perrigo acquisition.

57.     The public response to the Foundation's announcement was highly negative, and reports in both the *New York Times* and the *Wall Street Journal* questioned the so-called "independence" of the Foundation.  *See* Steven Davidoff Solomon, *A So-Called Independent Foundation Enters the Mylan-Teva Fray*, N.Y. TIMES, July 23, 2015 ("For those who think that the stichting is in Mylan's back pocket, this edict provides more evidence.  It is clear that although the stichting is supposed to be independent, it would do anything to prevent Teva from acquiring Mylan."); Ronald Barusch,[2] *Dealpolitik: Mylan Foundation Just Says No to Teva*, THE WALL STREET JOURNAL (wsj.com law blog), July 13, 2015 ("the aggressive rejection of Teva, without any indication that the stichting would consider any improvements, reads to me like the stichting and Mylan telling Teva to get lost rather than a struggle by an independent player to accommodate complex and differing interests.  That makes it sound to me like a super poison pill rather than an independent decision maker.").

---

[2]     Ronald Barusch is a retired partner at the Skadden Arps firm.

***The Call Option to the Stichting Constituted a Change of Control in Violation of
NASDAQ Rule 5635(b) and Compelled Teva to Withdraw Its Bid***

58.    On July 27, 2015, Teva publicly announced that it had withdrawn its $82-per-
share proposal to acquire New Mylan.  In reaction to that news, the price of New Mylan common
stock fell more than 14% to $56.37 per share, well below Teva's $82 per-share offer.

59.    There can be no genuine dispute that New Mylan's issuance of the Call Option to
the Foundation triggered the requirements of NASDAQ Rule 5635.  According to NASDAQ
Rule 5635 (b), "[s]hareholder approval is required prior to the issuance of securities when the
issuance or potential issuance will result in a change of control of the Company."  On its website,
NASDAQ provides guidance regarding when that change-of-control provision applies:

> FAQ – What is a change of control for purposes of the shareholder approval
> requirement of Listing Rule 5635(b)?
>
> Generally, a change of control would occur when, as a result of the issuance, an
> investor or a group would own, or have the right to acquire, 20% or more of the
> outstanding shares of common stock or voting power and such ownership or
> voting power would be the largest ownership position.  However, NASDAQ will
> consider all facts and circumstances concerning a transaction, including whether
> there are any other relationships or agreements between the company and the
> investor or group.

The issuance of the Call Option resulted in a transfer of 50% of the voting power in New Mylan,
far surpassing NASDAQ's 20% threshold.  Further, the totality of the circumstances, including
the Foundation's ability to block Teva's (or any other) takeover bid, evidences that a change in
control has taken place.  Shareholder approval was therefore required Under Rule 5635(b) prior
to issuance of the Call Option.

***The Vote by Shareholders of Old Mylan to Approve the Merger Did Not Satisfy the
Requirements of NASDAQ Rule 5635(b)***

60.    As discussed above, NASDAQ Rule 5635(b) unambiguously requires shareholder
approval "***prior to*** the issuance of securities when the issuance or potential issuance will result in

a change of control" and, further, issuance of the Call Option to the Foundation gave the Foundation the right to acquire 50% of the voting power of New Mylan.

61.     Although Old Mylan shareholders approved a capital structure of New Mylan that included Preferred Shares that *could* be used in a call option involving a stichting, the vote to approve the Merger *did not* approve the *issuance* of any such Preferred Shares.  According to Professor Davidoff Solomon, writing in *The New York Times*:

> Under Nasdaq and New York Stock Exchange rules, companies that are listed on exchanges in the United States cannot just issue shares.  Instead, limits are placed on share issues to protect shareholders from companies issuing hugely dilutive amounts of stock.
>
> Mylan is listed on the Nasdaq, which has . . . a "change of control rule," which requires that any issue or potential issue of securities that would result in a change of control of the company must be preapproved by shareholders.
>
> ***The mere creation of the Dutch stichting most likely sets off a shareholder vote*** . . . . The rule require[s] that Mylan's shareholders must preapprove the issue of the shares to the stichting.  Note also that the change of control rule talks about the "potential issuance" of securities, so it has arguably already been set off. (Emphasis added.)

62.     Nevertheless, there has been no vote by Mylan shareholders related to the creation of the stichting.  In fact, as discussed above, by representing that New Mylan would be bound by the NASDAQ listing rules without concurrently disclosing and seeking approval for the *issuance* of Preferred Shares, the Individual Defendants necessarily implied that the vote by shareholders of Old Mylan to approve the Merger did not constitute approval for the issuance of any Preferred Shares.  According to Professor Davidoff Solomon:

> Mylan's proxy statement for [the Merger] speaks only of the potential formation of a stichting (the trust was set up on April 3, only a few days before Mylan's hostile bid for Perrigo).  ***There was no specific vote of shareholders on the stichting, which is presumably what Nasdaq rules require***.

> Indeed, there are federal rules about bundling proposals in proxies, and they
> would almost certainly require a separate vote on the creation of the Dutch trust.
> (Emphasis added.)

63.     New Mylan has likewise acknowledged that it is bound by NASDAQ Rule 5635

with respect to certain transactions that require shareholder approval.  On May 5, 2015, New

Mylan filed a preliminary proxy statement to seek shareholder approval of the Perrigo

acquisition through a transaction that would transfer 39% of New Mylan's voting control to

Perrigo shareholders.  In doing so, New Mylan expressly admitted that NASDAQ listing rules

require a separate shareholder vote to authorize the issuance of such shares:

> Under Dutch law, … [t]he approval of Mylan shareholders at a general meeting is
> therefore required to consummate the Acquisition.  ***Also, under the NASDAQ
> listing rules, listed companies are required to obtain shareholder approval to
> issue, in connection with an acquisition, a number of ordinary shares that is
> greater than 20% of the company's total number of ordinary shares outstanding
> before the issuance***.  The approval of Mylan shareholders at a general meeting is
> therefore required to consummate the Share Issuance.  (Emphasis added.)

64.     Moreover, a vote by shareholders of Old Mylan to approve the issuance of

Preferred Shares would have been ineffective because the Call Option was issued by New

Mylan.  Accordingly, NASDAQ Rule 5635(b) required a separate approval by shareholders of

New Mylan prior to the issuance of the Call Option.

### The Proxy Was False and Misleading

65.     The Proxy was materially misleading in its representations that New Mylan would

comply with NASDAQ listing rules and requirements.  As discussed above, the issuance of the

Call Option triggered the application of NASDAQ Rule 5635(b), which requires shareholder

approval for any transaction that would constitute a change of control of the Company.

Defendants not only represented that New Mylan would comply with NASDAQ rules, but

agreed that such compliance was a precondition to the closing of the Merger.  Shareholders

relied on that representation when casting their votes in connection with the Merger.  Indeed, the

company and the Individual Defendants intended for shareholders to rely on that representation, including the shareholder protections and corporate governance requirements inherent in NASDAQ's listing rules.

66.     The Individual Defendants' representation that New Mylan would comply with NASDAQ requirements constituted a material misrepresentation.

67.     In addition, the Proxy's disclosure of the theoretical possibility that New Mylan might adopt a Dutch Poison Pill did not disclose, or seek approval of, Defendants' immediate intention to do so and issue the Call Option.  Because the Proxy did not disclose the Individual Defendants' intent to promptly form the Foundation and issue the Call Option, the Proxy was materially misleading.

68.     Moreover, to the extent that the Individual Defendants agreed to adopt the Dutch Poison Pill even prior to the issuance of the Proxy on December 24, 2014, the Proxy was materially misleading.  Section 2.1 of the Form of Shareholder Agreement, included as Annex B to the Proxy and entitled *Restrictions on Offering Transactions*, established certain restrictions on New Mylan's ability to issue equity securities for a certain period following the closing of the Merger, but notably provided that "nothing in this Section 2.1 shall prevent New Mylan from issuing any preference shares to the Foundation (stichting) to which New Mylan has granted a call option to acquire such preference shares, ***as contemplated by Section 2.6 of the Business Transfer Agreement***" included as Annex B to the Proxy (emphasis added).

69.     Section 2.6 of the Business Transfer Agreement, in turn, provided that "Mylan and New Mylan shall take, or cause to have been taken, such actions as are necessary so that, as of the Effective Time [(defined as the date and time the merger becomes effective)], ***the Additional Matters shall have been implemented***" (emphasis added).

70.     The term "Additional Matters" referred to in Section 2.6 of the Business Transfer Agreement was defined in Section 1.1 as follows:   "'Additional Matters' shall mean the transactions set forth on Exhibit D."  The referenced "Exhibit D," however, was omitted from the Proxy and not provided to Old Mylan's shareholders.

71.     The carve-out from New Mylan's covenant in Section 2.1 of the Form of Shareholder Agreement makes sense *only if* the creation of the Foundation (and the concomitant agreement to grant it a Call Option) was among the "Additional Matters" identified on the withheld Exhibit D.

72.     The Individual Defendants breached their fiduciary duties to Old Mylan shareholders not only because they did not disclose the material fact that the company ***had already agreed*** to form a foundation and grant it a call option ***before*** the shareholders voted on the Merger, but also because their issuance of the Stichting deprived Old Mylan shareholders of significant value.

73.     Old Mylan's shareholders did not know that their holdings would decline in value due to a change in control without any shareholder vote, and by concealing New Mylan's pre-existing commitment to implement a Dutch Poison Pill, the Individual Defendants misrepresented the value of consideration to be received by Old Mylan shareholders in connection with the Merger.

74.     To explain, the total value of the Merger was approximately $5.3 billion.  The Proxy represented that following the Merger, shareholders of Old Mylan would own 78% of New Mylan, and Abbott Labs would own 22% of New Mylan.  That representation implied that Old Mylan was worth approximately $4.134 billion in the Merger ($5.3 billion x 78%).  At the

time of the Merger, Old Mylan had 374,273,573 outstanding shares, implying that each share of Old Mylan was valued at $11.05 in the Merger.

75.    Economic studies indicate that U.S. companies with poison pills generally trade at a 6% discount to companies that have not implemented a poison pill.   The Individual Defendants' efforts to conceal the fact that New Mylan already had committed to implement a Dutch Poison Pill, therefore, materially impacted the value of the consideration offered to shareholders of Old Mylan in the Merger.   By failing to disclose the full truth about the Call Option, the Individual Defendants deprived Old Mylan shareholders of the right to cast an informed vote regarding whether to hold securities in a company that had a Dutch Poison Pill in place and thus would have traded at a corresponding discount.

## CLASS ACTION ALLEGATIONS

76.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of (i) themselves and all similarly situated former shareholders of Old Mylan who owned shares of Old Mylan as of December 13, 2014, were entitled to vote on the Merger, and received the Merger consideration (the "Class"); and (ii) a subclass of all members of the Class who received shares of New Mylan in connection with the Merger and continuously owned shares of New Mylan through the April 3, 2015 formation of the Foundation (the "Subclass").

77.    This action is properly maintainable as a class action.

78.    The Class and Subclass are so numerous that joinder of all members is impracticable.   The Class and Subclass consist of thousands of shareholders who are scattered throughout the United States.   As of October 29, 2014, there were 374,273,573 outstanding common shares of Old Mylan.

79.     There are questions of law or fact common to the Class and the Subclass.  Those questions include, *inter alia*:  (a) whether the Individual Defendants breached their fiduciary duties to the shareholders of Old Mylan; (b) whether the company breached a contract with shareholders of Old Mylan who voted in favor of the Merger; (c) whether Old Mylan's shareholders were improperly deprived of value in the Merger; (d) whether the vote on the Merger was effective; (e) whether shareholder approval was required prior to the issuance by New Mylan of the Call Option; and (f) whether the vote by shareholders of Old Mylan to approve the Merger was effective for purposes of approving the issuance of the Call Option as required by NASDAQ Rule 5635(b).

80.     Plaintiffs' claims are typical of the claims of the Class and Subclass.  Plaintiffs were shareholders of Old Mylan on the record date established by the Individual Defendants for purposes of obtaining approval for the Merger, and Plaintiff Arnold was a shareholder of New Mylan through the date on which Defendants breached their representations in forming the Foundation.  Plaintiffs' claims are typical of other members of the Class and Subclass, and Plaintiffs are not subject to any unique claims or defenses by Defendants.

81.     Plaintiffs will fairly and adequately assert and protect the interests of the Class. Plaintiffs' attorneys are experienced class action attorneys with a demonstrated successful history of representing shareholders' interests nationally.  Plaintiffs' chosen counsel is fully prepared and qualified to represent the interests of the Class and Subclass.  Plaintiffs do not have any conflict of interest that would impair their ability to prosecute this action on behalf of the Class and Subclass.  Plaintiffs and their counsel have adequate financial resources to assure that the interests of the Class and Subclass will be adequately represented and will not be harmed through the prosecution of this action.

82.     Prosecution of this action as a class action also provides a fair and efficient method for adjudication of the controversy for the following reasons:  (i) common questions of law and fact predominate over any question affecting only individual members of the Class or Subclass; (ii) the size of the Class and Subclass indicates that prosecution of this action as a class action would be more efficient than the prosecution of individual claims by Class and Subclass members; (iii) the prosecution of separate actions by individual members of the Class and Subclass would risk either inconsistent or varying adjudications with respect to individual members of the Class and Subclass, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class and Subclass, which would as a practical matter be disjunctive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and (iv) Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and Subclass.

### COUNT I
### BREACH OF CONTRACT
### (Against Mylan N.V.)

83.     Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

84.     Plaintiffs Arnold and Roofers bring this count on behalf of themselves and the Subclass against New Mylan (as successor-in-interest to Old Mylan) for breach of contract.

85.     Old Mylan formed a contract with the shareholders of Old Mylan who voted in favor of the Merger in order to accomplish the reincorporation through the Merger.  Specifically, Old Mylan represented and offered that New Mylan would comply with NASDAQ listing rules,

including Rule 5635(b), in exchange for shareholder support for the Merger.  The members of the Subclass accepted that offer, and a binding contract was formed.

86.      The Subclass members performed their obligations under the contract when they supported the Merger, refrained from objecting to the Merger, and/or voted in favor of the Merger.

87.      Through the Merger, New Mylan accepted all the rights and obligations of Old Mylan, including the contractual obligations of Old Mylan as described above.

88.      The Company breached the contract when New Mylan adopted the Dutch Poison Pill and issued the Call Option without shareholder approval.

89.      New Mylan's breach of contract has harmed the Subclass by depriving them of their right to vote on the issuance of any securities by New Mylan that would result in a change of control.

90.      The Subclass has no adequate remedy at law.

<div align="center">

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Against the Individual Defendants)**

</div>

91.      Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

92.      Plaintiffs bring this count on behalf of themselves and the Class against the Individual Defendants for breach of fiduciary duty.

93.      Pursuant to the Pennsylvania law applicable to their actions as directors and officers of Old Mylan, the Individual Defendants owed the Class a fiduciary duty of candor.  By virtue of their positions as directors of Old Mylan, the Individual Defendants had the power to

influence and/or cause, and did influence and/or cause, Old Mylan to issue the false disclosures complained of herein.

94.     Each Individual Defendant was required to fully disclose the material circumstances, procedures, and terms of the Merger so that shareholders of Old Mylan could make a fully informed decision with respect to the Merger.

95.     The Individual Defendants failed to fulfill their fiduciary duties in connection with the Merger, which resulted in shareholders of Old Mylan being deprived of their opportunity to cast a fully informed vote with respect to the Merger.  Specifically, in the Proxy, the Individual Defendants misleadingly claimed that New Mylan would comply with NASDAQ regulations and failed to disclose that they imminently intended to form or had already agreed to form the Foundation and issue the concomitant Call Option.

96.     As a result of the Individual Defendants' breaches of fiduciary duty as set forth above, the Class has been harmed.

## <u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Holding New Mylan liable for breach of the company's contractual obligations to the Subclass;

B.      Holding the Individual Defendants liable for breaching their fiduciary duties of candor and disclosure to the Class;

C.      Rescinding the vote of shareholders of Old Mylan to approve the Merger;

D.      Awarding the Class compensatory damages, together with pre- and post-judgment interest;

E.      Awarding Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees and expenses; and

F.      Awarding such other and further relief as is just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: September 4, 2015

<div style="margin-left: 40%;">

*/s/ Benjamin J. Sweet*
Benjamin J. Sweet
CARLSON LYNCH SWEET &
KILPELA, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: 412-322-9243
Fax: 412-231-0246

Mark Lebovitch
Adam Hollander
Alla Zayenchik
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-554-1400
Fax: 212-554-1444

Mark C. Gardy
James S. Notis
Meagan A. Farmer
GARDY & NOTIS, LLP
126 East 56th Street, 8th Floor
New York, NY 10022
Tel: 212-905-0509
Fax: 212-905-0508

Jay W. Eisenhofer
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8505
Fax: 646-722-8502

</div>

Michael J. Barry
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7065
Fax: 302-622-7100

*Counsel for Plaintiffs*