IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CITY OF RIVIERA BEACH GENERAL EMPLOYEES RETIREMENT SYSTEM, DORIS ARNOLD, ROOFERS LOCAL 149 PENSION FUND, MARSHA BLAKE, and B.W. LEWIS on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | Civil Action No. 2:15-cv-821 |
| | ) | |
| Plaintiffs, | ) ) | United States District Judge Mark R. Hornak |
| v. | ) ) | United States Magistrate Judge Cynthia Reed Eddy |
| MYLAN N.V., HEATHER BRESCH and ROBERT J. COURY, | ) ) ) ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

CYNTHIA REED EDDY, United States Magistrate Judge

## I.    RECOMMENDATION

This is a consolidated putative class action brought by Plaintiffs City of Riviera Beach General Employees Retirement System ("Riviera Beach"), Doris Arnold, Roofers Local 149 Pension Fund, Marsha Blake, and B.W. Lewis on behalf of themselves and all others similarly situated ("Plaintiffs").[1]  Plaintiffs were holders of common stock in Mylan, Inc. ("Old Mylan").  In 2015, in an alleged tax inversion scheme, said shares were cancelled and converted into shares of Mylan N.V. ("New Mylan") following a merger wherein New Mylan acquired Old Mylan and

---

[1]   The actions at 2:15-cv-821, 2:15-cv-941, and 2:15-cv-1539 have been consolidated into this single action.  (ECF Nos. 38, 61).  The operative pleading herein is the consolidated amended class action complaint from September 4, 2015 (ECF No. 39), which Plaintiffs Blake and Lewis subsequently joined on December 21, 2015.  (ECF No. 61).

1

certain non-U.S. businesses of Abbott Laboratories ("Abbott Business"). In seeking shareholder approval of this merger, Old Mylan, through its directors and officers, including Defendants Heather Bresch and Robert J. Coury (collectively "Individual Defendants"), sent Old Mylan a proxy statement/prospectus ("proxy") that described the terms of the merger. Old Mylan shareholders voted to approve the merger, and shortly thereafter, Plaintiffs claim that New Mylan and Individual Defendants (collectively "Defendants") took actions that directly violated certain representations made in the proxy, which were not in the shareholders' best interests, but rather in the interests of New Mylan management and other New Mylan stakeholders. Said actions by Defendants, according to Plaintiffs, resulted in a deprivation of material economic value associated with Plaintiffs' common shares.

The consolidated amended class action complaint ("complaint") consists of two counts. In Count I, Plaintiffs (except for Riviera Beach) assert a breach of contract claim against New Mylan as the successor in interest to a purported contract formed between Old Mylan and Old Mylan shareholders. In Count II, Plaintiffs assert a claim for breach of the fiduciary duty of candor under Pennsylvania law against the Individual Defendants. There are currently three pending motions before the Court: (1) partial motion for summary judgment filed by Plaintiffs (except for Riviera Beach) with respect to only Count I for breach of contract against New Mylan [ECF No. 42];[2] (2) motion to dismiss the complaint filed by Defendants for failure to state a claim upon which relief may be granted [ECF No. 54]; and (3) motion to deny Plaintiffs' partial motion for summary judgment filed by New Mylan [ECF No. 55 *errata* 56]. The Court has carefully reviewed all of the filings and considered all of the arguments made by the parties in connection with these motions. (ECF Nos. 43, 44, 57, 58, 59, 62, 63). For the reasons

_____

[2] On December 21, 2015, Plaintiffs Blake and Lewis joined this motion after it had already been filed. (ECF No. 61).

explained below, it is respectfully recommended that Defendants' motion to dismiss the complaint be granted; that the complaint be dismissed with prejudice; that the remaining two pending motions be denied as moot, and that the Clerk be ordered to mark this case closed.

## II.    REPORT

### A.    Standard of Review – Rule 12(b)(6)

The Federal Rules of Civil Procedure prescribe a notice pleading standard in which the pleader must come forward with "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To satisfy this standard, the well-pleaded factual content in the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and also "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation marks and citations omitted).

When faced with a motion to dismiss under Rule 12(b)(6), the Court separates the factual and legal elements of a claim. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). The well-pleaded facts are accepted as true, but legal conclusions may be disregarded. Id. at 210-11; see also Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010). Next, a determination is made as to "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Fowler, 578 F.3d at 211. This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. It does not, however, "impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the necessary elements of the claim. Twombly, 550 U.S. at 545. Moreover, because Plaintiffs' claims are premised on

the merger agreement and the proxy, the Court may consider statements offered by Defendants that were made in the proxy, but not quoted in the complaint. In re U.S. West, Inc. Sec. Litig., 65 F. App'x 856, 861 n.2 (3d Cir. 2003).

**B.    Factual Background**

In November 2014, Old Mylan, a publicly held global pharmaceutical company, entered into a merger agreement with New Moon, Moon of PA Inc., a merger sub, and Abbott Laboratories, a global healthcare company, for purposes of creating a tax inversion.[3] (Compl. at ¶¶ 26, 27, 30).[4] This merger agreement stated that New Mylan, a recently created entity, would acquire Old Mylan and Abbott Business, with New Mylan being the surviving entity, organized under the laws of the Netherlands. (Compl. at ¶ 30). Under the terms therein, Old Mylan shareholders would own approximately 78% of New Mylan after the merger while affiliates of Abbott Labs would own the remaining 22%, and New Mylan's ordinary shares would continue to be listed on the NASDAQ Global Select Market under the symbol "MYL." (Compl. at ¶ 31).

Around this same general time period, in the fall of 2014, there were rumors reported in the financial press that Teva Pharmaceuticals Industries N.V. ("Teva") – a larger competitor of Old Mylan – was interested in pursuing an acquisition of Old Mylan. (Compl. at ¶¶ 50, 52). Individual Defendants were aware of Teva's interest in acquiring Old Mylan at this time. (Compl. at ¶ 52). Nevertheless, on December 24, 2014, Old Mylan shareholders were sent a

---

[3]   According to the complaint, a tax inversion is a strategy utilized by certain corporations domiciled in the United States "to lessen or eliminate their tax obligations to the United States by reincorporating oversees" by merging "with and into a corporation organized under the laws of a foreign country – one with a more flexible tax structure – and the shares of the U.S. corporation are cancelled and exchanged for shares in the newly-created (and usually identically named) foreign entity." (Compl. at ¶ 28). At the time of this merger agreement, for tax inversions to be valid and recognized, the owners of the original U.S. corporation could not own 80% or more of the surviving foreign corporation. (Compl. at ¶ 29).

[4]   Citations to the consolidated amended class action complaint, ECF No. 39, *hereinafter*, (Compl. at ¶ __).

proxy, which was also filed with the SEC, seeking the necessary shareholder approval of the merger. (Compl. at ¶ 33). Prior to the proxy being sent to the shareholders, Individual Defendants approved the statements made therein, and signed a letter requesting that the shareholders approve the merger under the terms described in the proxy. (Compl. at ¶ 47).

Regarding the proposed merger, the proxy stated the following:

> If the Merger is completed, each share of Mylan common stock issued and outstanding immediately prior to the effective time of the Merger (the "effective time") will be cancelled and automatically converted into and become the right to receive one New Mylan ordinary share. The one-for-one ratio is fixed, and, as a result, the number of New Mylan ordinary shares received by the Mylan shareholders in the Merger will not fluctuate based on the market price of a share of Mylan common stock prior to the Merger. ***The New Mylan ordinary shares will be registered with the SEC and are expected to be listed on the NASDAQ Global Select Market ("NASDAQ") under the symbol "MYL."***

(Compl. at ¶ 33) (emphasis in complaint). The proxy further stated that:

> For so long as its shares will be listed on NASDAQ, New Mylan will be required to meet certain requirements relating to ongoing communication and disclosure to New Mylan shareholders, including a requirement to make any annual report filed with the SEC available on or through New Mylan's website and to comply with the 'prompt disclosure' requirement of NASDAQ with respect to earnings and dividend announcements, combination transactions, stock splits, major management changes and any substantive items of an unusual or non-recurrent nature. ***Issuers listing shares on NASDAQ must also meet certain corporate governance standards, such as those relating to … approval by New Mylan shareholders of certain transactions.***

(Compl. at ¶ 36) (emphasis in complaint). The proxy also stated that "[i]t is a condition to the completion of the Merger that the New Mylan ordinary shares to be issued to Mylan shareholders pursuant to the Merger be approved for listing on NASDAQ or the New York Stock Exchange," which both have "change of control rules." (Compl. at ¶ 34).

Relevant here, NASDAQ's change of control rule, Rule 5635(b), states that "[s]hareholder approval is required prior to the issuance of securities when the issuance or

potential issuance will result in a change of control of the Company."[5]  (Compl. at ¶ 35).

Notwithstanding its recognition that NASDAQ has rules requiring that "certain transactions" be

approved by shareholders, which Plaintiffs assert necessarily include the change of control rule,

the proxy made the following "generic" and "theoretical" statements about a mechanism

commonly utilized by companies organized under the laws of the Netherlands known as a

"Dutch poison pill:"

> Under Dutch law, various protective measures are permissible. New Mylan's governance arrangements include several provisions that may have the effect of making a takeover more difficult or less attractive, including:
>
>> • the power of the New Mylan Board to issue to a Dutch foundation [also known as a "Stichting"] a call option to acquire preferred shares that, if exercised (see "Rights Agreement/Preferred Shares"), could delay a potential takeover or allow New Mylan to further discuss with a potential acquirer its future plans for New Mylan as well as to search for strategic alternatives; and
>>
>> • requirements that certain matters, including the amendment of the New Mylan Articles (see "Amendment of Governing Documents" above), may only be brought to the General Meeting for a vote upon a proposal by the New Mylan Board.
>
> *        *        *
>
> Dutch law permits a company to issue to a Dutch foundation a call option to acquire preferred shares that, if exercised, could delay a potential takeover or allow such company to further discuss with a potential acquiror [*sic*] its future plans for the company as well as to search for strategic alternatives. ***New Mylan has not issued a call option to a Dutch foundation for New Mylan preferred shares.*** A Dutch foundation's governing documents generally provide that the call option will be exercised if the Dutch foundation determines such exercise to be (i) in the best interests of the company and the business conducted by it and (ii) necessary to maintain the status quo and/or to enable the company's management to explore alternative scenarios. By exercising the option to acquire a company's preferred shares, a Dutch foundation temporarily dilutes the voting rights of the company's holders of ordinary shares, ***thereby preventing the holders of ordinary***

---

[5]  The New York Stock Exchange's change of control rule, Rule 312.03(d), similarly states, "[s]hareholder approval is required prior to an issuance that will result in a change of control of the issuer."

6

**_shares from exercising control_** while the preferred shares remain outstanding. The number of preferred shares held by a Dutch foundation is limited so that, after giving effect to the exercise of a call option, it will not exceed the number of outstanding ordinary shares of the company at such time.

(Compl. at ¶ 43) (emphasis in complaint).

Although the statement quoted above asserts that "New Mylan has not issued a call option to a Dutch foundation for New Mylan preferred shares," Plaintiffs allege that at the time this proxy was sent to Old Mylan shareholders, Individual Defendants already intended to implement a Dutch poison pill, without further shareholder approval, in connection with Teva's pursuit in acquiring Old Mylan, which was not disclosed in the proxy. (Compl. at ¶¶ 39, 43). It is Plaintiffs' position, however, that regardless of whether Dutch poison pills are permissible under Dutch law, in order to comply with the NASDAQ listing requirements, the company would have to attain shareholder approval, in accordance with NASDAQ's change of control rule, prior to implementing a Dutch poison pill.[6]

In response to the proxy, Old Mylan shareholders voted to approve the merger on January 29, 2015. (Compl. at ¶ 3). Upon the closing of the merger, New Mylan was the surviving entity organized under the laws of the Netherlands. Defendant Bresch became the CEO and a director of New Mylan. (Compl. at ¶ 23). Defendant Coury became Executive Chairman and a director of New Mylan. (Compl. at ¶ 24).

Approximately five weeks after the merger closed, on April 3, 2015, New Mylan announced in a Form 8-K that it had entered into a call option agreement with a Foundation called Stichting Preferred Shares Mylan. (Compl. at ¶ 47). Under this agreement, the Foundation was granted an option to acquire New Mylan preferred shares in an amount equal to the number of New Mylan ordinary shares issued. (Compl. at ¶ 47). Specifically, the issuance

---

[6]  The Court notes that because this sentence is solely a legal conclusion, not a factual allegation, it is not entitled to the assumption of truth. It is included here only for the purpose of providing context.

of the call option gave the Foundation the right to acquire 50% of the voting power of New Mylan. (Compl. at ¶¶ 48, 51). In other words, according to Plaintiffs, this agreement granted the Foundation the absolute right to block any offer to buy New Mylan, regardless of the reason. (Compl. at ¶¶ 47, 51). New Mylan did not seek shareholder approval prior to taking this action.

Additionally, in seeking to fend off Teva's hostile takeover bid, Defendants allegedly initiated their own pursuit of a hostile takeover of New Mylan's smaller competitor, Perrigo Company plc ("Perrigo"). (Compl. at ¶ 54). New Mylan first contacted Perrigo regarding a proposed merger on April 6, 2015, and made a public announcement on April 8, 2015 proposing to acquire Perrigo for cash and stock worth of $205 per Perrigo share, or approximately $29 billion. (Compl. at ¶ 54).

On April 21, 2015, Teva went public with its unsolicited hostile pursuit to acquire New Mylan, announcing a bid for cash and stock valued at $82 per share, or approximately $43 billion in total, which at the time represented a 48.3% premium to New Mylan's unaffected share price. (Compl. at ¶ 50).

On April 29, 2015, New Mylan raised its own offer to acquire Perrigo to $232.23 per Perrigo share, or over $34 billion.[7] (Compl. at ¶ 54). Thus far, Perrigo shareholders have rejected Mylan's efforts to reach agreement on a merger transaction. (Compl. at ¶ 54).

On June 19, 2015, Teva announced that it had acquired shares representing 4.61% of the total outstanding shares of New Mylan, stating that it planned to vote those shares against New Mylan's hostile takeover of Perrigo. (Compl. at ¶ 55).

On July 23, 2015, in light of New Mylan still being pressed by Teva in Teva's hostile takeover pursuit of New Mylan, together with New Mylan being rebuffed on its own pursuit of

---

[7]  As background, Plaintiffs note that on May 5, 2015, New Mylan filed a preliminary proxy statement to seek shareholder approval of the Perrigo acquisition through a transaction that would transfer 39% of New Mylan's voting control to Perrigo shareholders. (Compl. at ¶ 63).

its hostile acquisition of Perrigo, the Foundation publicly announced that it had formally exercised the call option (Dutch poison pill) and acquired voting control of New Mylan. (Compl. at ¶ 56). The Foundation stated that it exercised the call option for the purpose of blocking the hostile takeover of New Mylan by Teva. (Compl. at ¶ 56). As such, the Foundation indicated that it would use 4.61% of its own voting power to vote for the Perrigo acquisition, which would negate the 4.61% stake that Teva intended to vote against the Perrigo acquisition. (Compl. at ¶ 56).

On July 27, 2015, Teva publicly announced that it had withdrawn its proposal to acquire New Mylan, causing the price of New Mylan common stock to fall more than 14% to $56.37 per share, which was well-below Teva's offer of $82 per share. (Compl. at ¶ 58).

### C. Claims in the Complaint

In Count I, Plaintiffs (except for Riviera Beach) assert the following breach of contract theory against New Mylan.[8] In soliciting Old Mylan shareholder approval of the merger, Old Mylan represented and offered in the proxy that in exchange for said shareholder approval, New Mylan would comply with the NASDAQ Listing Rules, necessarily including Rule 5635(b), the change of control rule. This offer from Old Mylan to comply with NASDAQ's listing rules was accepted by the Old Mylan shareholders when they voted in favor of approving the merger. Accordingly, a binding contract was formed between Old Mylan and the Old Mylan shareholders. By virtue of the merger, New Mylan accepted all of the rights and obligations of Old Mylan, including the above purported contractual obligations to comply with the NASDAQ rules. New Mylan breached this purported contract when it allegedly violated Rule 5635(b) by issuing a call option to the Foundation without first obtaining shareholder approval. As a result

---

[8]    Hereafter, for ease of reference, the Court will refer to this claim as being asserted by Plaintiffs generally, although we recognize that Riviera Beach is not included as part of this claim.

of this alleged breach, Plaintiffs were deprived of their right to vote on the issuance of any securities by New Mylan that would result in a change of control. Plaintiffs contend that there is no adequate remedy at law with respect to this claim.

In Count II, Plaintiffs contend that Individual Defendants Bresch and Coury, as former directors and officers of Old Mylan, are liable to Plaintiffs *directly* under applicable Pennsylvania law for breach of fiduciary duty of candor as follows. As directors of Old Mylan during the relevant time period, Individual Defendants owed Old Mylan shareholders a fiduciary duty of candor, which they breached when they failed to fully disclose the material circumstances, procedures, and terms of the merger so that the Old Mylan shareholders could make a fully informed decision with respect to whether or not to approve the merger. In particular, Individual Defendants made misleading claims in the proxy that New Mylan would comply with NASDAQ regulations, including the change of control rule, even though Individual Defendants imminently intended to form, or had already agreed to form, the Foundation and issue the concomitant call option/Dutch poison pill in direct violation of those rules. Because it was not disclosed to Old Mylan shareholders that New Mylan would be implementing a Dutch poison pill without shareholder approval, Old Mylan shareholders were unable to assess the appropriate value of their shares under the proposed merger. Individual Defendants' failure to disclose their intention to create the Foundation and implement the Dutch poison pill without shareholder approval resulted in the value of the shares being discounted not only because it resulted in a loss of control, but also because it made New Mylan immune from unsolicited takeovers. To that end, companies with poison pills generally trade at a 6% discount to companies that have not implemented a poison pill. Therefore, due to Individual Defendants' failure to disclose this information, Old Mylan shareholders accepted inadequate consideration in

connection with their decision to approve the merger, causing them to experience harm.

**D.    Discussion**[9]

The parties are in agreement that Pennsylvania law governs both of Plaintiffs' counts in the complaint.  The Court will discuss these claims *seriatim*.

**1.    Breach of Contract Claim against New Mylan**[10]

To state a claim for breach of contract under Pennsylvania law, the plaintiffs are tasked with alleging facts showing that there was a contract, that the defendants breached it, and that the plaintiffs suffered damages from the breach.  McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010).  The elements of contract formation are "offer, acceptance, and consideration or mutual meeting of the minds."  Ribarchak v. Mun. Auth. of City of Monongahela, 44 A.3d 706, 708 (Pa. Cmwlth. 2012) (citing Yarnall v. Almy, 703 A.2d 535, 538 (Pa. Super. 1997)).

At the outset, the Court notes that Plaintiffs present inconsistent contract formation theories in their legal memoranda, conflating the distinction between bilateral and unilateral contracts.  The difference between the two is explained in *First Home Savings Bank, FSB v. Nernberg*, as follows:

> Traditional contract law distinguishes between bilateral and unilateral contracts. Bilateral contracts involve two promises and are created when one party promises to do or forbear from doing something in exchange for a promise from the other party to do or forbear from doing something else. Unilateral contracts, in contrast, involve only one promise and are formed when one party makes a promise in exchange for the other party's act or performance. Significantly, a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree

---

[9]    When citing to the parties' briefs, the Court will refer to the page number in the body of the document, as opposed to the number in the ECF stamp.  When citing to the parties' exhibits, the Court will reference the page number contained in the ECF stamp.

[10]    Although the Court recommends denying as moot Plaintiffs' motion for summary judgment as to the breach of contract claim, to the extent that the Plaintiffs' made arguments in their brief in support of said motion (ECF No. 43) that are applicable to the disposition of Defendants' motion to dismiss, the Court has considered and may discuss or cite to same.

completes performance.

648 A.2d 9, 14 (Pa. Super. 1994) (citing Greene v. Oliver Realty, Inc., 526 A.2d 1192 (Pa. Super. 1987)) (internal citations omitted). With these principles in mind, it is clear that Plaintiffs' theory on the element of acceptance assumes that there is a unilateral contract, as they contend that their act of voting in favor of the merger was both an acceptance of the alleged promises made in the proxy *and* performance of the contract.[11] However, Plaintiffs' theory as to the element of consideration assumes that there is a bilateral contract, as they vaguely assert that a bilateral exchange of promises occurred between the parties (even though they do not allege or identify any promises made by the shareholders).[12] Nevertheless, Plaintiffs cannot establish either type of contract because, as more fully discussed below, no promises were made in the proxy.

In support of their motion to dismiss, Defendants convincingly argue that Plaintiffs have failed to sufficiently allege all three elements of contract formation.

a.    Offer

Defendants initially contend that New Mylan cannot be found liable for breach of contract because the proxy was not an offer to Old Mylan shareholders. "An offer is a manifestation of the willingness to enter into a bargain so made as to justify another person in

---

[11] See ECF No. 43 at 19 ("Old Mylan's shareholders accepted that offer when they voted in favor of the Merger."); id. at 20 ("When Old Mylan's shareholders voted in favor of the Merger, they both accepted the Company's offer and performed under the contract that was created."); ECF No. 62 at 7 ("Defendants do not dispute that the Proxy contains language stating that the Company would remain subject to NASDAQ listing rules so long as it remained on that stock exchange ... Likewise, they do not dispute that shareholders voted in favor of the Merger."); see also Compl. at ¶¶ 85-86 ("Old Mylan formed a contract with the shareholders of Old Mylan who voted in favor of the Merger in order to accomplish the reincorporation through the Merger...The members of the subclass accepted that offer" and "performed their obligations under the contract when they supported the Merger.").

[12] See ECF No. 43 at 14, 18 ("Courts routinely hold that a bilateral exchange of promises constitutes sufficient consideration to form a binding contract.") (citation omitted); ECF No. 62 at 8 ("[T]he parties exchanged bilateral promises, thereby providing consideration for the contract…").

understanding that his assent to that bargain is invited and will conclude it.'" <u>A.S. v. Office of Dispute Resolution</u>, 88 A.3d 256, 265-66 (Pa. Cmwlth. 2014) (citations and marks omitted). "An offer to contract must be intentional and sufficiently definite in its terms, and no offer will be found to exist where its essential terms are unclear." <u>Bair v. Manor Care of Elizabethtown, PA, LLC</u>, 108 A.3d 94, 98 (Pa. Super. 2015) (citations, marks and alteration omitted). "In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 582 (3d Cir. 2009) (citing <u>Ingrassia Constr. Co., Inc. v. Walsh</u>, 486 A.2d 478, 483 (Pa. Super. 1984)). "Accordingly, 'a true and actual meeting of the minds is not necessary to form a contract.'" <u>Id.</u> Nevertheless, "one cannot suppose, believe, suspect, imagine or hope that an offer has been made." <u>Morsetti v. La. Land and Expl. Co.</u>, 564 A.2d 151, 152 (Pa. 1989).

Primarily relying on *Unisuper Ltd. v. News Corp.*, 2005 WL 3529317 (Del. Ch. 2005) (unpublished) ("News Corp."), Plaintiffs make the sweeping assertion that "courts have held that corporations and shareholders enter into binding contracts when the corporation obtains shareholder votes in favor of a transaction in exchange for the promise that shareholder approval will be required prior to effectuation of certain corporate actions." (ECF No. 43 at 14). However, as more fully explained below, the facts of the present case are markedly different than the facts of *News Corp.*, as the parties in *News Corp.* engaged in extensive negotiations, conducting several meetings over the course of more than three months, and the company-defendant did not dispute that it reached an agreement with the shareholders.[13]

---

[13] Plaintiffs also cite *In re Nat'l Intergroup, Inc. Rights Plan Litig.*, 1990 WL 92661 (Del. Ch. 1990) (unpublished) in support of their breach of contract theory. However, as Defendants note, that case is distinguishable because the Court assumed without discussion that the bargained for stockholder resolution, not a proxy, was the basis for the contract and the defendants conceded that said resolution

In *News Corp.*, the defendant News Corp., an Australian-based corporation, announced and proposed a plan of reorganization, which was contingent on a shareholder vote, to reincorporate as a Delaware corporation. 2005 WL 3529317, at *1. Various groups of shareholders had concerns with this reorganization proposal, in part, because under Delaware law, the company's board of directors is able to issue a poison pill without shareholder approval, while shareholder approval is required in such situations under Australian law. Id. These groups of shareholders had multiple meetings with News Corp., informing it of these concerns, and drafted and sent News Corp. a set of proposed changes to the reorganization plan, including a provision prohibiting the board from implementing a poison pill. Id. at *1-2. In response, News Corp. informed the shareholders that the proposals would not be adopted and that there would be no further negotiations. Id. at *2. The shareholders reacted by circulating a press release recounting the negotiations with News Corp. and stating that the proposed reincorporation would decrease shareholder protections, thereby resulting in investor opposition to News Corp.'s plan to reincorporate under Delaware law. Id.

This shareholder press release caused News Corp. to reverse itself and resume negotiations with the shareholders. Id. At this stage of the negotiations, there were five key issues to be resolved, three of which the parties agreed would be dealt with through the adoption of binding provisions in the new, Delaware certificate of incorporation. Id. It was agreed that the issue regarding whether the Board could implement the poison pill without shareholder vote "would be dealt with through the adoption of a so-called 'board policy,'" rather than amendment to the certificate of incorporation, due to time restraints that News Corp. was facing in connection with its reorganization proposal. Id. at *2-3. An individual from News Corp.

created the contractual rights at issue. See Nat'l Intergroup, 1990 WL 92661, at *6 (interpreting the language of the 1989 Stockholder Resolution under the ordinary rules of contract construction to determine whether the 1989 Stockholder Resolution amended the 1986 Rights Plan).

allegedly promised that News Corp.'s board would not circumvent the voting requirement by "rolling over" a poison pill for successive one-year terms on substantially similar terms and conditions or to the same effect without shareholder approval. Id. at *3. Thereafter, News Corp. announced the terms of this agreement by issuing a press release, sending an e-mail entitled "agreed deal points" to one of the negotiating shareholders, and mailing a letter to all of its shareholders and options holders. Id. The shareholders then voted to approve the reorganization plan. Id. A few weeks later, a potential hostile acquirer of News Corp. emerged, and in response, News Corp.'s board adopted a poison pill. Id. One year later, the board extended the poison pill without a shareholder vote in direct contravention of the board policy that was negotiated for months with its shareholders. Id.

As a result, the shareholders commenced an action against News Corp., alleging, *inter alia*, a count for breach of contract, contending that there was both a written agreement and an oral agreement regarding the adoption of a board policy *and* that the board policy was not revocable. Id. at *4-5. Notably, News Corp. conceded that it had entered into an agreement with the shareholders, which was embodied in the press release and letter sent to shareholders promising to adopt a board policy. Id. at *4. However, News Corp. contested that this agreement provided that the board policy was not unilaterally revocable by the board, arguing that under Delaware law, board policies are non-binding and revocable by the board at any time. Id. The court expressed doubt as to the plaintiffs' assertion that the contract contemplated that the board was unable to revoke the subject board policy, pointing to the lack of factual allegations in the complaint and many perceived ambiguities and potential holes in the plaintiffs' theories. Id. at *4-6 & nn. 39, 43. However, notwithstanding said doubt, because of the liberal pleading standard afforded to plaintiffs at the motion to dismiss stage, the court found that the

provision in the press release and letter stating that the board policy will not permit the pill to be "rolled over" was ambiguous such that when drawing all reasonable inferences in favor of plaintiffs, it could be inferred that there was an agreement between the parties that the board policy was not revocable at will by the board.  Id. at *5.

According to Plaintiffs, the facts of *News Corp.* are "strikingly similar" to the facts in this case because in both cases, letters were mailed by the companies to the shareholders soliciting the requisite shareholder approval for the companies' proposals and in both cases the shareholders responded by approving the solicited proposal.  (ECF No. 43 at 16-18).  However, this argument ignores that in *News Corp.,* the company and its shareholders engaged in extensive, arms-length negotiations for several months.  Indeed, unlike the facts in this case, in *News Corp.,* there was an exchange of promises.  The company promised to adopt the subject board policy in exchange for the shareholders' promise to approve the reorganization plan.  It was therefore clear that the parties came to a meeting of the minds with regard to this term. Thus, the main issue for the court to decide in *News Corp.* was not whether the parties alleged the existence of an agreement; rather, the dispute surrounded whether the agreed-upon board policy was unilaterally revocable by the board.  In contrast, in this case, Plaintiffs do not allege that there were any negotiations or "agreed deal points" between Old Mylan and its shareholders regarding any of the statements contained in the proxy.  Furthermore, as explained below, there are simply no factual allegations in the complaint to support Plaintiffs' conclusory assertions that Defendants objectively manifested an intent to be bound by sending the shareholders a proxy containing descriptive disclosures informing the shareholders of the circumstances surrounding the merger (as they were required to do under the applicable securities regulations) and soliciting the shareholders to vote in favor of same.

Plaintiffs submit that the following written statements in the proxy are a memorialization of Defendants' intent to be bound: (1) that it was a condition to the consummation of the merger that New Mylan would either trade on the NASDAQ or NYSE; (2) that it was expected that New Mylan would continue to trade on the NASDAQ under the same symbol; (3) that New Mylan would continue to be bound by the NASDAQ listing rules for as long as it was trading on NASDAQ; and (4) that NASDAQ requires its issuers to adhere to "certain corporate governance standards, such as those relating to … approval by New Mylan shareholders of certain transactions." (ECF No. 43 at 16-19). Plaintiffs therefore argue that "[t]he terms of the parties' agreement in this case could not be more clear: if the shareholders voted in favor of the Merger, the corporation would remain listed on NASDAQ and subject to NASDAQ listing rules, including Rule 5635(b) requiring shareholder approval prior to the issuance of securities when such issuance could result in a change of control." (ECF No. 43 at 18).

However, Defendants assert, and Plaintiffs do not dispute, that the proxy and the statements contained therein, including the statements identified in the preceding paragraph that Plaintiffs assert formed the basis of a contract, were required to be disclosed via proxy under federal securities law. See 17 C.F.R. § 230.145(a)(2) (requiring the company to make disclosures to shareholders in a proxy/prospectus statement when there is a merger plan); id. at § 230.140.14a-101, Item 12(c) (requiring the corporation to "[s]tate the reasons for the proposed modification or exchange and the general effect [of the modification or exchange of securities] upon the rights of the existing security holders."); id. at Item 12(f) ("Instruction. If the existing security is presently listed and registered on a national securities exchange, state whether the registrant intends to apply for listing and registration of the new or reclassified security on such exchange or any other exchange …."). Pointing to *McKesson HBOC v. N.Y. State Common Ret.*

*Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003) ("McKesson") and *In re U.S. West., Inc. Sec. Litig.*, 65 F. App'x 856, 864 (3d Cir. 2003) ("U.S. West"), Defendants aptly argue that the proxy in this case is insufficient to constitute an offer or form a contract.

In *McKesson*, the corporation and the directors commenced an action for, *inter alia*, unjust enrichment against their shareholders. Because a claim for unjust enrichment is foreclosed when there is a valid contract in place, the Court had to first determine whether a contract governed the rights and obligations of the parties when the company sent shareholders a proxy for purposes of soliciting shareholder approval with regard to a proposed merger. McKesson, 339 F.3d at 1091-92. The shareholders asserted that a contract was formed under those circumstances. As such, *McKesson's* analysis is applicable to the present case, notwithstanding that the company, rather than the shareholders, commenced the action.

Like the situation here, the shareholders in *McKesson* claimed that their "approval of the Merger Agreement in accord with the terms set out in the Prospectus should be construed as an acceptance of [the company's] offer to sell the newly issued shares, thus creating the contract." Id. at 1092. Applying Delaware law, the Court in *McKesson* flatly rejected this argument. The Court stated that the merger agreement, not the prospectus, was the foundation of the merger transaction. The prospectus was simply a "disclosure document (Form S-4) required under federal securities laws as an adjunct to the Merger Agreement." Id. (citing 17 C.F.R. § 230.145). The prospectus stated, in pertinent part, that "[t]he merger cannot be completed unless the stockholders of both companies approve the merger agreement and the transactions associated with it." Id. The Court held that such a statement contained in a mandatory disclosure for purposes of soliciting shareholder approval in favor of a merger was insufficient to constitute an offer under contract law. Id.

Further, *McKesson* noted that in some circumstances, such as a tender offer situation, courts have found a contract to exist where the disclosures called for an investment by the shareholders. Id. at 1092-93 (citing In re Gulf Oil/Cities Service Tender Offer Litig., 725 F.Supp. 712, 731 (S.D.N.Y. 1989)); see also 6A Fletcher Cyc. Corp. § 2841.10 at 358 (rev. ed. 2013) ("A binding contract is created when the shareholder tenders his or her securities in accordance with the terms of the offer."). However, because the shareholders in *McKesson* were specifically advised not to tender their shares when voting to approve the merger, the Court determined that this factor also weighed in favor of finding that the prospectus did not form the basis of a contract between the company and the shareholders. Id. at 1092-93; see also Northstar Fin. Advisors Inc. v. Schwab Invs., 779 F.3d 1036, 1053 (9th Cir. 2015) (discussing the distinction drawn in *McKesson* between a tender offer situation and a situation where a proxy merely references a merger agreement and solicits a majority vote by the shareholders). The proxy in this case, like the proxy in *McKesson*, stated that "You do not need to take any action at this time. Please do not send your Mylan stock certificates," advised the shareholders that an affirmative majority of the votes cast was necessary for the merger to be approved, and stated that once the merger was approved all shares would be cancelled and automatically converted into and become the right to receive one New Mylan ordinary share. (ECF No. 57-1 at 20, 24; ECF 57-4 at 28; Compl. at ¶ 33).[14] Although not binding on this Court, *McKesson's* holding on this issue – that such mandatory disclosures in proxies do not constitute a contractual offer – is well-reasoned and persuasive.[15]

---

[14] Because Plaintiffs' claims are premised on the merger agreement and the proxy, the Court may consider these statements offered by Defendants even though they were not specifically mentioned in the complaint. U.S. West, 65 F. App'x at 861 n.2.

[15] Plaintiffs' attempt to distinguish *McKesson* is unavailing. Plaintiffs contend that *McKesson* "held *solely* that a prospectus did not constitute an offer from an *acquiring* corporation to the acquired entity's

Defendants also cite *U.S. West*, *supra*, a non-precedential decision from the United States Court of Appeals for the Third Circuit applying Delaware law. In *U.S. West*, the Court affirmed the district court's dismissal of the plaintiffs' promissory estoppel claim, i.e., a claim asserting a "contract less consideration." 65 F. App'x at 863-64. Because the "primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings in securities in interstate commerce," the Court held that routine disclosures to shareholders in a prospectus made in connection with a proposed merger, absent allegations of exceptional circumstances, do not constitute a promise between the disclosing company and its shareholders. Id; accord Territory of U.S. Virgin Islands v. Goldman, Sachs & Co., 937 A.2d 760, 805 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) ("Descriptive statements in disclosure statements do not amount to a promise" under Delaware law). Even when accepting all of the facts in the complaint as true and drawing all reasonable inferences in a light most favorable to Plaintiffs, Plaintiffs have failed to allege the existence of exceptional circumstances such that the routine disclosures made in the proxy regarding the merger vote can be considered a contractual offer.

Plaintiffs argue that *U.S. West* is distinguishable because it only analyzed whether a promise was made for purposes of a promissory estoppel claim, not whether an offer was made for a breach of contract claim. In *U.S. West*, the Court discussed that while a promissory

shareholders. …It did not address the issue in this case: whether a prospectus can constitute an offer from an *acquired* entity (here, Old Mylan) to its own shareholders. The issue and holding of *McKesson* are thus distinguishable from the issue in this case." (ECF No. 62 at 6) (emphasis in original). However, Plaintiffs fail to explain the significance of this distinction or why this should alter the Court's analysis. Moreover, Plaintiffs' narrow reading of *McKesson's* holding is not supported by other cases which have summarized *McKesson's* holding but made no mention of it being limited in such a way. See Northstar, 779 F.3d at 1053; In re Charles Schwab Corp. Sec. Littig., 2009 WL 1371400, *2-5 (N.D.Cal. 2009). And a fair reading of *McKesson* leads to the conclusion that its holding is not limited solely to the circumstances identified by Plaintiffs. Notably, Plaintiffs do not attempt to contest that the disclosures at issue in the proxy here, which form the basis for Plaintiffs' breach of contract claim, were required under the same securities regulations that were applicable in *McKesson*.

estoppel theory is "generally a consideration substitute for promises which are reasonably relied upon," plaintiffs asserting such claims must still plead "the basic contractual element of mutual assent [to the terms of the agreement]." 65 F. App'x at 864 (quotations and marks omitted). Therefore, although *U.S. West* assessed a promissory estoppel claim under Delaware law, not a claim for breach of contract, its reasoning is nevertheless persuasive to the facts of this case, as both legal theories require that a party make a promise and that the parties reach an agreement. See <u>Sovereign Bank v. BJ's Wholesale Club, Inc.</u>, 427 F.Supp.2d 526, 536 (M.D.Pa. 2006) (finding *U.S. West's* application of promissory estoppel under Delaware law to be in accord with the doctrine of promissory estoppel under Pennsylvania law); <u>Crouse v. Cyclops Indus.</u>, 745 A.2d 606, 610 (Pa. 2000) (the doctrine of promissory estoppel *sounds in contract*, as it deals with otherwise unenforceable *agreements* between the parties and serves as an equitable remedy to a contract dispute); <u>Peluso v. Kistner</u>, 970 A.2d 530, 532 (Pa. Cmwlth. 2009) ("Promissory estoppel enables a person to enforce a *contract-like promise* that would be otherwise unenforceable under *contract law principles*.") (citing 28 AM.JUR.2d. *Estoppel and Waiver* § 57 (2008)) (emphasis added); <u>Nernberg</u>, 648 A.2d at 14 (it is a requirement of both bilateral and unilateral contracts that a promise be made by the promisor).

Further, as Defendants note, other courts have recognized, in other factual circumstances, the general rule that a proxy is not an offer or contract. See <u>Stitching Pensioenfonds ABP v. Credit Suisse Group AG</u>, 2012 WL 6929336, *5 (N.Y. Sup. Ct. 2012) ("A prospectus, or a prospectus supplement, is indeed not a contract."); <u>In re Intelogic Trace, Inc.</u>, 174 F.3d 198, 1999 WL 152944, *1 (5th Cir. 1999) (affirming dismissal of a breach of contract claim because the prospectus at issue was not a contract); <u>In re Charles Schwab Corp. Sec. Littig.</u>, 2009 WL 1371409, *5 (N.D.Cal. 2009) ("Granted, in certain circumstances prospectuses can constitute a

contract," such as "the tender offer situation… As *McKesson* explained, however, offering documents under securities laws are generally different than contract 'offers' (a far narrower concept), and bare allegations do not equate the two."); Woolf v. Univ. Fidelity Life Ins., Co., 849 P.2d 1093, 1096-97 (Okla. Civ. App. 1992) (rejecting the shareholders' argument that a descriptive proxy informing the shareholders of their rights resulted in the formation of a contract); see also Oliveira v. Sugarman, 130 A.3d 1085, 1102 (Md. App. Jan. 28, 2016) (rejecting the plaintiff-shareholders' assertion that a contract was formed through statements made in a proxy proposing an incentive compensation plan when the shareholders failed to point to any language in either the proxy or the plan which would constitute an offer).

In contrast, despite submitting extensive memoranda on this issue, Plaintiffs have been unable to identify a single case – from Pennsylvania or otherwise – supporting their position that the proxy in this case can be considered a contractual offer. As discussed at length above, Plaintiffs' near-exclusive reliance on *News Corp.* is misplaced, as the facts here are entirely distinguishable from the facts of *News Corp.* Defendants have more than sufficiently established that under the facts of this case, the proxy was not an offer. For this reason alone, Plaintiffs' breach of contract claim should be dismissed. Nevertheless, we will further discuss why Plaintiffs have failed to establish the remaining elements of contract formation, acceptance and consideration.

    b.    Acceptance

In Pennsylvania, "[t]he acceptance of the offer must be absolute and identical with the terms of the offer." Hedden v. Lupinsky, 176 A.2d 406, 408 (Pa. 1962). "An offer may be accepted by conduct and what the parties do pursuant to the offer is germane to show whether the offer was accepted." Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. 1993)

(quotation and internal marks omitted). Initially, because there was no offer, there was nothing for the shareholders to accept.

Furthermore, *McKesson's* discussion on the element of acceptance is also applicable and persuasive here. In *McKesson*, the Court rejected the shareholders' assertion that their vote to approve the merger under the terms described in the prospectus constituted an acceptance. Plaintiffs make the same argument here. *McKesson* held that an acceptance did not occur because the shareholders who objected to the merger could not separately opt out or contract out of the merger. McKesson, 339 F.3d at 1093. Like the proxy in *McKesson*, the proxy in this case unequivocally stated that an individual shareholder could not opt out of the transaction, that the merger was contingent on a majority vote, and that even those shareholders who did not vote in favor of the merger would have their shares converted to New Mylan shares. (ECF No. 57 at 17) (citing ECF Nos. 57-1 at 20, 38-39; 57-2 at 22, 60-62; 57-4 at 46)).

Additionally, although Plaintiffs contend that *News Corp.* is "squarely on point" here, see (ECF No. 43 at 18), they ignore that in *News Corp.* the parties had extensive arms-length negotiations for several months resulting in a bilateral agreement where the shareholders "*agreed* to vote in favor of News Corp.'s reorganization in consideration for News Corp.'s *promise* to submit any extensions of its poison pill to a shareholder vote." News Corp., 2005 WL 3529317, at *2 (emphasis added). Here, in contrast, the complaint contains no allegations of negotiations, promises, or agreements between the parties in connection with the merger.

Therefore, Plaintiffs have also failed to establish the second element of contract formation, acceptance.[16]

---

[16] Plaintiffs' alternative argument that the facts of this case also support a finding that there is a contract implied in fact is without merit. See (ECF Nos. 43 at 16 & n.12; 62 at 25). "A contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from the acts in the light of the surrounding

c.      Consideration

"The touchstone of any valid contract is mutual assent and consideration."  Bair v. Manor Care of Elizabethtown, PA, LLC, 108 A.3d 94, 96 (Pa. Super. 2015).   "Consideration is a bargained for exchange, evidenced by a benefit to the promisee and a detriment to the promisor." Estate of Beck, 414 A.2d 65, 68 (Pa. 1980).  At the outset, consideration is lacking in this case because, as discussed above, no promises or offers were made in the proxy.  See McKesson, 339 F.3d at 1091-92; U.S. West, 65 F. App'x at 863-64; Territory of U.S. Virgin Islands, 937 A.2d at 805.

Indeed, under applicable securities regulations, Old Mylan was required to disclose in the proxy whether or not it was expected that New Mylan would continue trading on the NASDAQ, see 17 C.F.R. § 230.140.14a-101, Item 12(f), and its statements that New Mylan would continue to be bound by NASDAQ's rules and be required to meet certain corporate governance standards if the merger occurred are obvious statements of fact, not promises.  As such, unlike *News Corp.*, which Plaintiffs again assert is applicable on this issue, the facts in this case, as alleged in the complaint, simply do not support Plaintiffs' conclusory assertion that a bilateral exchange of promises occurred between the Old Mylan shareholders and Old Mylan.  Likewise, there are no facts whatsoever plausibly establishing that a bargained for exchange occurred via the routine mandatory disclosures of fact made in the proxy and the shareholders' approval of the merger.

Thus, Plaintiffs have also failed to establish the third element of contract formation, consideration.

---

circumstances."  Liss & Marion, P.C. v. Recordex Acquisition Corp., 983 A.2d 652, 659 (Pa. 2009). Here, it simply cannot be inferred from the parties' conduct that they intended to form a contract when the shareholders voted in favor of the merger after the Defendants sent the shareholders a routine proxy regarding same, as required by securities regulations, which specifically stated that the shareholders could not opt out of the transaction and that, if approved, their shares would be converted into New Mylan shares regardless of whether they voted in favor of the merger.

d.    Conclusion as to Breach of Contract Claim

Given that all three elements of contract formation are missing, Plaintiffs' breach of contract claim against New Mylan fails to plausibly state a claim upon which relief may be granted.    Because no contract was ever formed, the Court need not address the parties' remaining arguments about whether Plaintiffs sufficiently alleged that New Mylan, as successor in interest to Old Mylan, breached the alleged contract.    See McShea, 995 A.2d at 340 (existence of a valid contract is the first element in a breach of contract claim).    As such, Defendants' motion to dismiss this claim should be granted.

We now must consider whether Plaintiffs should be afforded an opportunity to amend this claim.    See Phillips v. Cnty of Allegheny, 515 F.3d 224, 236 (3d Cir. 2008) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile.").    Because Plaintiffs' contract formation theory is based solely on the statements made in the proxy and the shareholders' act of voting in favor of the merger, allowing Plaintiffs to amend this claim would be futile, as it would not cure these legal deficiencies and would still fail to state a claim.    See Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.").    Therefore, Plaintiffs' breach of contract claim should be dismissed with prejudice.    As a result, it is unnecessary to consider the other two pending motions involving this claim – Plaintiffs' motion for partial summary judgment as to Count I only (ECF No. 42) and New Mylan's motion to deny partial summary judgment (ECF No. 55 *errata* 56); thus, they may both be denied as moot.

**2.    Breach of Fiduciary Duty Claim against Individual Defendants**

Plaintiffs assert a *direct* claim against Individual Defendants for breach of the fiduciary

duty of candor. Specifically, the complaint alleges that Individual Defendants breached this alleged duty by intentionally failing to disclose in the proxy that the post-merger value of New Mylan would be significantly discounted due to the shareholders' loss of control of New Mylan and because New Mylan would be immune from unsolicited takeovers. As a result, Plaintiffs allege that they unknowingly accepted a reduced amount for their Old Mylan shares, which caused them financial harm. However, this claim fails because shareholders of a corporation do not have standing to bring such a claim directly against directors of a corporation.

"To have standing to sue individually, the shareholder must allege a direct, personal injury – that is independent of any injury to the corporation – and the shareholder must be entitled to receive the benefit of any recovery." <u>Hill v. Ofalt</u>, 85 A.3d 540, 548 (Pa. Super. 2014); <u>Morison Informatics, Inc. v. Members 1st Fed. Credit Union</u>, 97 A.3d 1233, 1237 (Pa. Super. 2014). In *Hill* and *Morrison*, the Pennsylvania Superior Court elaborated on this concept by quoting the following passage:

> If the injury is one to the plaintiff as a shareholder as an individual, and not to the corporation, for example, where the action is based on a contract to which the shareholder is a party, or on a right belonging severally to the shareholder, or on a fraud affecting the shareholder directly, or where there is a duty owed to the individual independent of the person's status as a shareholder, it is an individual action. If the wrong is primarily against the corporation, the redress for it must be sought by the corporation, except where a derivative action by a shareholder is allowable, and a shareholder cannot sue as an individual.... Whether a cause of action is individual or derivative must be determined from the nature of the wrong alleged and the relief, if any, that could result if the plaintiff were to prevail.
>
> In determining the nature of the wrong alleged, the court must look to the body of the complaint, not to the plaintiff's designation or stated intention. The action is derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent dissipation of its assets.... If damages to a shareholder result indirectly, as the result of an injury to the corporation, and not directly, the shareholder cannot sue as an individual.

12B FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5911 (2013).

Assessing the complaint under the above framework, we note that this claim is not based on any independent contract between any of the Plaintiffs and Individual Defendants; it is not based on a right belonging severally to Plaintiffs; it does not allege that the purported fraud affected any of the Plaintiffs directly (as opposed to the group of shareholders as a whole); and it does not identify a duty owed to Plaintiffs independent of their status as shareholders. Rather, the gravamen of the complaint is that Individual Defendants' failure to make disclosures in the proxy resulted in the post-merger value of New Mylan shares being significantly discounted. Consequently, said injuries "were indirect results of the harm suffered by the corporation, rather than individual wrongs suffered separately from their status as shareholders." See Morrison, 97 A.3d at 1238-39 ("[I]t is equally clear that the injures all were suffered as an indirect result of the wrongs done to the corporation… The losses were sustained solely by virtue of the status of [the plaintiffs] as owners and shareholders of the corporation."); 17 Pa.C.S. § 1717 (shareholders cannot directly sue directors for breach of a fiduciary duty that is owed to the corporation).

Additionally, other courts have likewise concluded that direct claims by shareholders for breach of fiduciary duty based on the diminution of value of their share price are barred, given that such claims belong to the corporation and that any injury suffered by the shareholders is only incidental or indirect. See, e.g., Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir. 1970) ("A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution of value of his corporate shares resulting from the impairment of corporate assets. In this situation, it has been consistently held that the primary wrong is to the corporate body and, accordingly, that the

shareholder, experiencing no direct harm, possesses no primary right to sue."); <u>Winer Family Trust v. Queen</u>, 503 F.3d 319, 338 (3d Cir. 2007) (shareholders were unable to assert a direct claim for breach of fiduciary duty against an entity that engaged in self-dealing at the direct expense of the company, which ultimately resulted in a diminution in value of the company's stock because such an injury, if proved, belongs to the company, not its shareholders, for which the company alone has standing to sue); <u>In re SemCrude L.P.</u>, 796 F.3d 310, 319 (3d Cir. 2015) ("'Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature.'") (applying Oklahoma law) (quoting <u>Feldman v. Cutaia</u>, 951 A.2d 727, 733 (Del. 2008)); <u>Penn Mont Sec. v. Frucher</u>, 502 F.Supp.2d 443, 465 (E.D.Pa. 2007) ("Courts typically treat share dilution as a derivative harm because the reduction in share value reflects the decline in value of the corporate entity as a whole.") (applying Delaware law); <u>Hamilton v. Allen</u>, 396 F.Supp.2d 545, 552 (E.D.Pa. 2005) (shareholders may not bring direct claims against directors or officers for breach of a common law fiduciary duty to recover for the diminution of assets to the funds) (applying Ohio and Massachusetts law, while looking to *Kauffman, supra*, for guidance); <u>In re Blackrock Mut. Funds Fee Litig.</u>, 2006 WL 4683167, *5-7 (W.D.Pa. 2007) (noting that Massachusetts law and Pennsylvania law are substantially the same in this area and holding that the plaintiff-shareholders did not allege that they suffered an injury that was distinct from the injuries suffered by the shareholders generally or distinct from the injuries suffered by the funds, notwithstanding that the fund's assets ultimately belonged to the shareholders); <u>Empire Life Ins. Co. of Am. v. Valdak Corp.</u>, 468 F.2d 330, 335 (5th Cir. 1972) (claims are derivative, rather than direct, where "each shareholder suffers relatively in proportion to the number of shares he owns."); <u>Dobry v. Yukon Elec. Co.</u>, 290 P.2d 135, 138 (Okla. 1955)

("[D]estruction or depreciation of the value of [a shareholder's] stock … is merely incidental to the wrong suffered by the corporation and affects all shareholders alike."); cf. In re Sunrise Sec. Litig., 916 F.2d 874, 886 (3d Cir. 1990) (in the context of RICO, noting that shareholders may not sue directly for diminution in share value because such an injury is sustained by all shareholders alike).

Furthermore, Plaintiffs do not cite a single case to the contrary. Indeed, all of the cases cited by Plaintiffs are factually dissimilar and some are actually unfavorable to Plaintiffs' theory. See Hill, 58 A.3d at 550 (the plaintiff was a 50% shareholder and brought a breach of fiduciary duty claim against the other 50% shareholder, suggesting that the defendant's duty arose from "the long recognized principle of Pennsylvania law that 'majority shareholders have a duty to protect the interests of the minority,'" which the Court rejected given their status as equal shareholders); White v. First Nat'l Bank of Pittsburgh, 97 A. 403, 405 (Pa. 1916) ("But the plaintiff has averred no injury to himself, except the indirect one [relating to the destruction of the value of his stock]… [T]he difficulty with the plaintiff's case is that he has failed to show any injury to himself apart from the injury to the corporation, in which he is a stockholder."); Liss v. Liss, 2002 WL 576510, *5-7 (Pa. Com. Pl. 2002) (the plaintiff (a 50% shareholder of a closely held corporation) actually alleged damage beyond merely the decrease in value of the company and his interest therein, as he also claimed that the defendant (the other 50% shareholder) took actions that directly and personally oppressed the plaintiff and excluded the plaintiff from the company's operations); McCoy-McMahon v. Godlove, 2014 WL 10558574, *4-6 (Pa. Super. 2014) (the plaintiff was a minority shareholder of a closely held corporation attempting to invalidate a merger, arguing that the merger constituted an unlawful "freeze out," the defendants engaged in oppressive conduct towards the plaintiff, the merger was procedurally improper, and

the totality of the circumstances suggested that there was fraud or fundamental unfairness);

Patterson v. Shelton, 2013 WL 3961047, *4-6 (Pa. Cmwlth. 2013) (interpreting the standing

provision of the Pennsylvania Nonprofit Corporation Law, which contains no bar against direct

claims).[17]

As such, because we look to the body of the complaint, not to Plaintiffs' designation or

stated intention, in determining whether Plaintiffs have alleged a direct injury separate and apart

---

[17] The Court notes that Plaintiffs also state in their brief that Section 7.01(b) of the American Law Institute ("ALI") Principles of Corporate Governance supports this claim. See (ECF No. 62 at 22-23). First, Section 7.01(b) expressly conflicts with Section 1717 of the Pennsylvania Business Corporation Law, which, as discussed *infra*, limits standing to sue to enforce a director's duty to the corporation or to a shareholder by a derivative action. 15 Pa.C.S. § 1717. Thus, the Pennsylvania Supreme Court would not adopt it. See Hill, 85 A.3d at 556 (similarly concluding that the Pennsylvania Supreme Court would not adopt Section 7.01(d) of the ALI Principles of Corporate Governance to the extent that it "would permit a shareholder to sue directly—and individually recover—for a breach of a director's duty to the corporation," as that is not consistent with Pennsylvania law).

Second, the comprehensive comments, notes, and case supplement to Section 7.01 belie Plaintiffs' assertion that they may bring a direct claim for the diminution of their share value against Individual Defendants. See Comment *d*, § 7.01 ("In general, courts have been more prepared to permit the plaintiff to characterize the action as direct when the plaintiff is seeking only injunctive or protective relief. In such situations, the policy considerations favoring a derivative action are less persuasive, *because typically the requested relief will not involve significant financial damages against corporate officials*…") (emphasis added); Reporter's Note, Section 2, § 7.01 ("The basic principle that a shareholder may not sue in an individual capacity to recover damages to an ownership interest in the corporation when the alleged damages are attributable to a prior injury to the corporation … is today generally accepted. This principle is premised not only on the policy considerations noted in Comment *d*, but also on the argument that a double recovery might result if the defendant were liable to both the corporation and its shareholders on the same claim."); Massey v. Merrill Lynch & Co., Inc., 464 F.3d 642, 647 (7th Cir. 2007) (diminution of corporation's stock value affects all shareholders and claim can only be brought by shareholders as a derivative action on behalf of the corporation itself); In re WorldCom, Inc., 323 B.R. 844, 851 (S.D.N.Y. 2005) (claims that were based on shareholder's allegations of fraud and misrepresentation that resulted in a diminution of the corporation's value were deemed a derivative action); May v. Coffey, 967 A.2d 495, 505 (Conn. 2009) (plaintiffs could not bring direct action because the corporation's receipt of less than fair value for its new shares of stock was not a separate and distinct harm to the minority shareholders); PricewaterhouseCoopers, LLP v. Massey, 860 N.E.2d 1252, 1257 (Ind. App. 2007) (dismissing directors/shareholders' claim against independent auditor for breach of fiduciary duty and fraud for lack of standing to sue in a direct action because the plaintiffs' damage was exclusively the result of a generalized decline in the corporation's share price); Lowen v. Galligan, 882 P.2d 104, 112 (Or. App. 1994) (no standing to bring direct action because the loss in value of investments in the company prior to a merger was not a special injury). Accordingly, Plaintiffs' reliance on Section 7.01(b) of the ALI Principles of Corporate Governance is misplaced.

from the injury suffered by the corporation, Plaintiffs' direct claim for breach of fiduciary duty against the Individual Defendants fails as a matter of law. Plaintiffs may not pursue an action against the Individual Defendants for the diminution of their post-merger share value because such a claim belongs to the corporation and any injuries suffered by Plaintiffs solely from their status as shareholders were only indirect and incidental to the direct harm suffered by the corporation.

Moreover, this claim also "fails as a matter of law because the board of directors of a Pennsylvania corporation does not have a fiduciary duty to individual shareholders." <u>Dugan v. Towers, Perrin, Forster & Crosby, Inc.</u>, 2012 WL 6194211, *18 (E.D.Pa. 2012). The Pennsylvania Business Corporation Law ("BCL") provides that a "director of a business corporation shall stand in a fiduciary relation *to the corporation* and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be *in the best interests of the corporation* and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa.C.S. § 1712 (emphasis added). Similarly, the BCL states that the "duty of the board of directors, committees of the board and individual directors … *is solely to the business corporation* … and may not be enforced directly by a shareholder or by any other person or group." 15 Pa.C.S. § 1717 (emphasis added). Notably, although the BCL allows directors to consider a variety of interests and factors, including the effects of any action upon any or all groups of shareholders affected by such action, 15 Pa.C.S. § 1715(a)(1), it does not impose "any legal or equitable duties, obligations or liabilities or create any right or cause of action against, or basis for standing to sue, the board of directors." 15 Pa.C.S. § 1717.

Here, Plaintiffs have "supported [t]his claim concerning the existence of a fiduciary duty with absolutely no argument," merely citing to a few cases in conclusory fashion. See Hill, 85 A.3d at 550. As Defendants note, however, the source of the fiduciary duty of candor (i.e., duty to disclose), like the source of all directors' fiduciary duties in Pennsylvania, is Section 1712. (ECF No. 63 at 2) (citing Cuker v. Mikalauskas, 692 A.2d 1042, 1049 n.3 (Pa. 1997) and W. Edward Sell & William H. Clarke, Jr., *Pa. Business Corporations* 1712.1-5 (1997)). As a result, because Individual Defendants owe fiduciary duties to only the corporation, and because, as demonstrated above, the injuries alleged in the complaint, if proved, were injuries which only directly harmed the corporation, Section 1717 explicitly proscribes Plaintiffs from bringing this direct claim for breach of fiduciary duty against the Individual Defendants for their incidental injuries associated with the diminution in the value of their post-merger shares. See Minielly v. Acme Cryogenics, Inc., 2016 WL 1221640, *7-8 (E.D.Pa. Mar. 28 2016); Dugan, 2012 WL 6194211, at *18; Stafford Inv. LLC v. Vito, 2008 WL 5062136, *2 (E.D.Pa. 2008); Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co., 2007 WL 2345281, *9-11 (E.D.Pa. 2007); Malmros v. Jones, 2004 WL 632726, *3-5 (E.D.Pa. 2004); B.T.Z., Inc. v. Grove, 803 F.Supp. 1019, 1021-22 (E.D.Pa. 1992). Simply put, there is no cognizable duty running from Individual Defendants to Plaintiffs with regard to this claim. Instead, only the corporation could bring such a claim against these Individual Defendants, and Plaintiffs have not attempted, nor have they stated a desire, to assert a derivative fiduciary duty claim against Individual Defendants on behalf of the corporation.[18]

---

[18]  Defendants' argued extensively in their opening brief that even if Plaintiffs wished to pursue a derivative fiduciary duty claim against the Individual Defendants, Plaintiffs would nevertheless be unable to do so. Specifically, Defendants asserted, with supporting authority, that Plaintiffs did not have standing to bring a derivative action on behalf of Old Mylan because, as a result of the merger, they did not own any shares at the time the action was commenced; that any derivative action would have to be brought on behalf of New Mylan in light of the merger but Plaintiffs did not plead any such allegations;

Therefore, Plaintiffs' direct claim for breach of the fiduciary duty of candor against the Individual Defendants should be dismissed. Even if Plaintiffs were given the opportunity to amend their complaint, they would be unable to cure the deficiencies of this claim. Thus, the Court should dismiss this claim with prejudice. See Winer, 503 F.3d at 339 (because the injuries were not separate and distinct from those suffered by the corporation, allowing the plaintiff to amend the breach of fiduciary duty claim would have been futile); Minielly, 2016 WL 1221640, at *8 ("Because the claim does not purport to be a derivative action, and the only basis for the claim is [the plaintiff's] status as a shareholder, the claim is not plausible and any attempt to amend would be futile.").

## III.    CONCLUSION

Based on the foregoing, it is respectfully recommended that Defendants' motion to dismiss (ECF No. 54) be granted in its entirety and the complaint (ECF No. 39) be dismissed with prejudice. It is further recommended that the two remaining pending motions – Plaintiffs' motion for partial summary judgment (ECF No. 42) and New Mylan's motion to dismiss Plaintiffs' motion for partial summary judgment (ECF No. 55 *errata* 56) – be denied as moot, and that the Clerk be ordered to mark this case closed.

In accordance with 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b)(2) of the Federal Rules of Civil Procedure, and the Local Rules for Magistrates, the parties have until May 24, 2016 to file objections to this Report and Recommendation. Unless the District Judge orders otherwise, a party may respond to another party's objections by June 7, 2016. Failure to file timely objections will constitute a waiver of any appellate rights. Brightwell v. Lehman, 637 F.3d 187,

---

Plaintiffs have not made a demand on either the Old Mylan or New Mylan board; and Plaintiffs cannot now assert a derivative claim against New Mylan because Dutch law prohibits such claims. (ECF No. 57 at 12-13). Plaintiffs did not respond to these arguments, and instead, continually asserted that they were pursuing a direct action against the Individual Defendants for harm suffered directly by the Plaintiffs, not the corporation. (ECF No. 62 at 20-24).

193 n. 7 (3d Cir. 2011).


Dated: <u>May 10, 2016</u>.                                    By the Court,

                                                               <u>s/ Cynthia Reed Eddy</u>
                                                               Cynthia Reed Eddy
                                                               United States Magistrate Judge



cc:     **THE HONORABLE MARK R. HORNAK**
        (electronic notification via CM-ECF)

        All counsel of record
        (electronic notification via CM-ECF)